RICHARD R. BEST*
BestR@sec.gov
LARA SHALOV MEHRABAN*
MehrabanL@sec.gov
MICHAEL PALEY*
PaleyM@sec.gov
CHRISTOPHER DUNNIGAN**
DunniganC@sec.gov
KRISTINE ZALESKAS**
ZaleskasK@sec.gov
SECURITIES AND EXCHANGE COMMISSION
200 Vesey Street
New York, NY 10281
Telephone: 212-336-0061 (Dunnigan)
* (Not admitted in this District)
** (Appearing Pursuant to Local Civil Rule 83.3(c)(3))

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> against <br><br> ONGKARUCK SRIPETCH, AMANDA FLORES, BREHNEN KNIGHT, ANDREW McALPINE ASHMIT PATEL, MICHAEL WEXLER , DOMINIC WILLIAMS,  ADTRON INC. aka STOCKPALOOZA.COM, ATG INC., DOIT, LTD., DOJI CAPITAL, INC., KING MUTUAL SOLUTIONS INC., OPTIMUS PRIME FINANCIAL INC., ORCA BRIDGE, REDLINE INTERNATIONAL, and UAIM CORPORATION, <br><br> Defendants. | Case No.:   '20 CV1864 MMAAGS <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint

against Defendants Ongkaruck Sripetch ("Sripetch"), Amanda Flores ("Flores"), Brehnen Knight ("Knight"), Andrew McAlpine ("McAlpine"), Ashmit Patel ("Patel"), Michael Wexler ("Wexler"), Dominic Williams ("Williams"), Adtron Inc. aka Stockpalooza.com ("Adtron"), ATG Inc. ("ATG"), DOIT Ltd. ("DOIT"), Doji Capital, Inc. ("Doji"), King Mutual Solutions Inc. ("King Mutual"), Optimus Prime Financial Inc. ("Optimus"), Orca Bridge, Redline International ("Redline"), and UAIM Corporation ("UAIM") (together, "Defendants"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1.      From at least August 2013 to at least December 2017 (the "Relevant Period"), Defendants, including seven individuals and nine entities controlled by certain of these individuals, worked in concert to engage in numerous fraudulent schemes and other violations of the federal securities laws, involving at least 20 penny stock companies.  The Defendants obtained at least $6 million in illicit sale proceeds from this illegal conduct, while harming retail investors who purchased shares during the schemes.

2.      Defendants Sripetch, Flores, and later, Knight, orchestrated numerous fraudulent "scalping" schemes, in which they obtained stock in penny stock issuers through various entities they controlled, funded internet promotions of these issuers – generally using intermediaries to funnel payment to the promoters – and then sold their stock into the investor demand they generated.

3.     The stock promotions did not disclose that the group of individuals who paid for the promotions intended to sell their shares.

4.     At various times, Patel, an attorney who obtained millions of shares from at least five of the issuers, purportedly as compensation for legal services to them, aided and abetted Sripetch, Flores, Knight, and the entity Defendants by timely selling promoted issuers' stock for the benefit of these Defendants, and wiring substantial portions of the sales proceeds to entities controlled by Knight and Sripetch.  Patel kept the remainder of the sales proceeds for himself.

5.     Moreover, at various times between 2013 and 2016, in violation of the registration requirements of the federal securities laws, Sripetch, Williams, Flores and various entities that they control sold over 24 million shares of ABBY Inc., a microcap issuer they also controlled and promoted.  These sales were not registered with the Commission, and were not exempt from registration.

6.     In 2016, Sripetch and Knight engaged in a manipulative cross-trading scheme in the stock of VMS Rehab Systems, Inc. ("VMS Rehab") to "build the chart" – *i.e.,* engaging in manipulative trading, such as wash trades and matched orders, to create a fictitious, attractive price and volume trading history for the stock – in advance of a promotional campaign.  They built the chart in advance of scalping schemes in order prime the market and to lend credibility to an imminent or incipient promotional campaign.

7.     Finally, in 2018 and 2019, Sripetch and Knight engaged in several schemes to "pump and dump" the stock of Argus Worldwide Inc. ("ARGW") along with ARGW's chief executive officer Wexler, and McAlpine, a former executive of a now-defunct offshore broker-dealer.

## VIOLATIONS

8.     By engaging in the conduct set forth in this Complaint, the Defendants violated Sections 5(a), 5(c) and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], and Sections 9(a) and 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78i(a) and 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

9.     Unless Defendants are permanently restrained and enjoined, they will again engage in the acts, practices, transactions, and courses of business set forth in this Complaint, and in acts, practices, transactions, and courses of business of a similar type and object.

## NATURE OF THE PROCEEDINGS AND THE RELIEF SOUGHT

10.     The Commission brings this action pursuant to the authority conferred upon it by Securities Act Section 20(b) [15 U.S.C. § 77t(b)], and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

11.     The Commission seeks a final judgment: (a) restraining and permanently enjoining all the Defendants from engaging in the acts, practices and courses of business

4

alleged against them herein and from committing future violations of the above provisions of the federal securities laws; (b) ordering all the Defendants to disgorge any ill-gotten gains they received and to pay prejudgment interest thereon; (c) ordering all the Defendants to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)], and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; (d) permanently barring all the Defendants from participating in an offering of penny stock pursuant to Securities Act Section 20(g) [15 U.S.C. § 77t(g)], and Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)]; (e) permanently barring Flores or Knight from acting as an officer or director of any issuer that has a class of securities registered pursuant to Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports pursuant to Exchange Act Section 15(d) [15 U.S.C. § 78o(d)]; and (f) ordering such other and further relief as the Court may deem just and proper.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to Securities Act Sections 20(b), 20(d), 22(a), and 22(c) [15 U.S.C. §§ 77t(b), 77t(d), 77v(a), and 77v(c)] and Exchange Act Sections 21(d) and 27 [15 U.S.C. §§ 78u(d) and 78aa.]

13.     Venue lies in the Southern District of California pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa]. Certain of the acts, practices, transactions, and courses of business constituting the violations of law alleged in this Complaint occurred within the Southern District of

California.  For example, Defendants Orca Bridge and Doji Capital are located in the District, Defendants Knight and Williams reside in the District, and certain trading and banking activity alleged in this Complaint occurred on-line via computers with IP addresses located in this District.

14.    In connection with the transactions, acts, practices, and courses of business alleged in this Complaint, Defendants directly or indirectly have made use of the means and instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange.

## DEFENDANTS

**Individual Defendants**

15.    **Sripetch**, age 45, also known as King Richards or Shelby Saint Claire, currently resides in Las Vegas, Nevada  He is the president of Defendant Adtron, the sole officer of Defendant King Mutual, and along with Defendant Flores, controls Defendant ATG.

16.    **Flores**, age 49, currently resides in Las Vegas, Nevada.  Along with Defendant Sripetch, she controls Defendant ATG.  She also held herself out as associated with Defendant Adtron.  From June 2013 until November 2015, Flores also served as CEO of ABBY, Inc., an issuer whose stock was among the subjects of the Defendants' scalping schemes, during her tenure as CEO.   Flores was a co-principal of Defendant Orca Bridge.

17.     **Knight**, age 55, resides in Escondido, California.  Knight is the president of Defendant Orca Bridge.

18.     **McAlpine** is a Canadian citizen and resides in the Cayman Islands. McAlpine is the former vice president of Legacy Global Markets, S.A., a now-defunct broker-dealer in Belize that was sued by the Commission in 2015.

19.     **Patel**, age 36, is a Canadian citizen and attorney, admitted in Illinois, who currently resides in Oakville, Ontario.  During most of period discussed in this Complaint, Patel was a resident of Annapolis, Maryland.

20.     **Wexler** is a Canadian citizen and resides in Ottawa, Canada.  During the relevant time period, Wexler was chief executive officer of VMS Rehab Systems Inc. and ARGW.

21.     **Williams,** age 37, resides in Bonita, California.  He is the purported control person of Defendant Optimus and held himself out as "Director of Investors" at Defendant Redline.  He is a former employee of Defendant ATG.

**Entity Defendants**

22.     **Adtron, Inc. a/k/a Stockpalooza.com ("Adtron" or "Stockpalooza")** is a Nevada corporation with its principal place of business in Las Vegas, Nevada.  It operates a stock tout website controlled by Defendant Sripetch.  Sripetch was Adtron's president and secretary.  At all relevant times, it shared an address with Defendants ATG, Optimus, and Orca Bridge.

23.    **ATG Inc. ("ATG")** is a California corporation controlled by Defendants Sripetch and Flores that has purported to be a consulting company providing marketing services to publicly-trading microcap companies.  At all relevant times, it shared a mailing address with Defendants Adtron, Optimus, and Orca Bridge.

24.    **DOIT** is an entity associated with a former employee of Defendant ATG.

25.    **Doji** is a California corporation with its current principal place of business in San Diego, California.

26.    **King Mutual** is a Nevada corporation with its principal place of business in Las Vegas, Nevada.  Sripetch is its sole officer.  Previously, King Mutual was a California corporation with its principal place of business in San Diego, California.

27.    **Optimus** is a California corporation, with its principal place of business in Las Vegas, Nevada.  Formerly owned by Defendant Flores, its current purported control person is Defendant Williams.  However, Defendants Flores and Sripetch have retained control of Optimus' bank account.  At all relevant times, Optimus shared a mailing address with Defendants ATG, Adtron and Orca Bridge.

28.    **Orca Bridge** is a Nevada corporation with places of business in Escondido, California and Las Vegas, Nevada.  Defendant Knight is Orca Bridge's CEO.  Flores was as a co-principal of Defendant Orca Bridge.  At all relevant times, Orca Bridge shared a mailing address with Defendants Adtron, ATG, and Optimus.

29.     **Redline** is an entity linked to both Defendants Sripetch and Knight, with places of business in Nevis and San Diego, California.  A May 2016 version of Knight's LinkedIn profile identified Knight as the COO of Redline.  Sripetch is listed as the contact person for Redline on its brokerage account.  Defendant Williams claimed to be "Director of Investors" at Redline.

30.     **UAIM** is an entity controlled by Sripetch.  Its last known address was in in Belize City, Belize.  Sripetch has represented himself as UAIM's CEO.

## FACTS

## Overview of the Illegal Scalping Schemes

31.     Beginning no later than August 2013 and continuing through at least February 2019, Sripetch and Flores (and later also Knight) orchestrated fraudulent schemes, using the Defendant entities to obfuscate their actions, in connection with at least 20 microcap issuers.

32.     These schemes followed the same general pattern:

- First, a subset of the Defendants obtained shares of a microcap issuer through convertible debt agreements, usually claiming to purchase convertible debt through a series of transactions involving intermediaries, and then converting the debt to stock.  Defendant Patel, who often acted at counsel for the promoted issuer, received shares in at least five of these issuers, purportedly as payment for legal services.

- Next, some of the Defendants would promote the issuer.  In some instances, they promoted the issuer through Sripetch's own website Stockpalooza.com. However, for most of the issuers, a Defendant or Defendants paid an intermediary entity (the "Conduit"), which then wired the funds to third-party promoters (minus a portion purportedly for a commission).

- The promotions did not identify any of the Defendants as the ultimate funder of the promotion, and did not disclose that the actual funder of the promotions was planning to sell stock in the issuers being promoted. Many of the promotions were silent on the funder's intentions. Others misleadingly indicated that there was a mere possibility the funder would sell.

- Following the promotions, liquidity of the issuer's stock increased and the share price rose, and the Defendants who held stock in that issuer promptly sold.

33. The practice of promoting a stock without disclosing a present or immediate intent to sell the stock is called "scalping", and violates the antifraud provisions of the securities laws.

34. Defendants Sripetch, Patel, Williams and Knight each obtained and sold shares, using accounts in their own names, in many of these schemes. In addition, Sripetch, Flores and/or Knight sold shares in various schemes through Defendant entities ATG, DOIT, Doji, King Mutual, Orca Bridge, Redline and UAIM.

35. On some occasions, Defendant Sripetch sent money directly to the Conduit for the stock promotion. On other occasions, Sripetch and/or Flores used Defendants Stockpalooza, ATG, Optimus and/or King Mutual to send funds to the Conduit for a promotion.

36. On at least one occasion, Defendants Sripetch and Knight, aided and abetted by Defendant Patel, also engaged in illegal manipulative trading to raise and support the stock price and to further create the appearance of active trading in advance of a stock promotion.

37.     In connection with these schemes, Flores, Knight, Patel, Sripetch and the

entity Defendants (the "Scalping Defendants") obtained illicit sales proceeds of over $6.6

million.

38.     With respect to the Scalping Defendants, the below chart summarizes the

issuers, dates or relevant promotional campaigns, the Defendants who sent funds to the

Conduit (if applicable), and the Defendants who sold shares as part of the scalping

scheme.

| Issuer (ticker) | Promotional Periods | Network Member Sent Funds to the Conduit Prior to Promotion | Network Member Dumping Shares |
|---|---|---|---|
| ABBY (ABBY) | August-December 2013; April-May 2015 | ATG<br>King Mutual<br>Optimus<br>Sripetch | DOIT<br>Doji<br>King Mutual<br>Redline<br>UAIM<br>Williams |
| Freedom Energy Holdings, Inc. ("Freedom Energy") (FDMF) | October 2013 | King Mutual | Doji |
| Kabe Exploration, Inc. (KABX) | November-December 2013 | ATG | King Mutual<br>Redline |
| Smart Ventures, Inc. (SMVR) | March-April 2014 | Sripetch<br>King Mutual | ATG<br>Doji<br>King Mutual |
| SuperDirectories, Inc. (SDIR) | March 2014 | Sripetch | Doji<br>Redline |
| Global Green, | June 2014 | Optimus | King Mutual |

| Issuer (ticker) | Promotional Periods | Network Member Sent Funds to the Conduit Prior to Promotion | Network Member Dumping Shares |
|---|---|---|---|
| Inc. (GOGC) | | | |
| Glow Holdings, Inc. (GLOH) | October 2014 | King Mutual | Sripetch |
| One Step Vending Corp. (KOSK) | October-November 2015 | King Mutual Sripetch | King Mutual Sripetch Associate |
| Formosa Liberty Corporation (FLIB) | January 2016 | Sripetch | Patel |
| Transnational Group, Inc. (TAMG) | May 2016 | Optimus | King Mutual |
| VMS (VRSYF) | May-June 2016; August-December 2016 | Optimus Sripetch King Mutual | Patel Knight Sripetch |
| Capital Ventures Europe Plc (CPVNF) | June 2016, August-September 2016, January 2017 | Optimus | Patel Knight Sripetch |
| Van Gold Resources, Inc. (VGRI) | June 2016 | Sripetch | Patel Sripetch |
| Andiamo Corp. (ANDI) | July-September 2016 | Sripetch Optimus King Mutual | Knight Sripetch Orca Bridge |
| American Transportation Holdings, Inc. (ATHI) | July 2016 | Optimus | Knight Sripetch |
| Textmunication Holdings, Inc. | March 2017 | Optimus | Sripetch |

| Issuer (ticker) | Promotional Periods | Network Member Sent Funds to the Conduit Prior to Promotion | Network Member Dumping Shares |
|---|---|---|---|
| (TXHD) | | | |
| N1 Technologies, Inc. (NTCHF) | September 2015; April 2017; July-August 2017 | Sripetch Adtron | Patel Sripetch |
| Acacia Diversified Holdings, Inc. (ACCA) | June 2017 | Adtron | Sripetch |
| REAC Group, Inc. (REAC) | September 2017 | Adtron Optimus | Orca Bridge |
| Mirage Energy Corp (MRGE) | October 2017; December 2017 | Optimus | Knight Sripetch Orca Bridge |
| Argus Worldwide Inc. (ARGW) | May-July 2018; November 2018; February 2019 | Adtron | Knight McAlpine Sripetch |

39.　　Alleged below are further details of some of these schemes.

**ABBY, Inc. Scalping Scheme**

40.　　By no later than June 2013, Sripetch and Flores gained control of a microcap issuer, ABBY, Inc. ("ABBY"), when Flores was appointed its CEO.[1]  Over the years, ABBY purported to be in various different businesses.  From 2013 to mid-2014, ABBY

---

[1]　　Flores served as ABBY's CEO until November 2015, but continued as ABBY's secretary and as a director.  Knight has been a director of ABBY at least since November 2015, and is currently ABBY's CEO.

disclosed in its public filings and reports that it was an exploration stage company with plans to investigate a viable gas deposit in Thailand.  Beginning in mid-2014, ABBY purported to be a company that invested in companies in the food and beverage, entertainment and social media sectors.  From early 2015 to the present, ABBY claims to be in the business of "disrupt[ing] and chang[ing] the way the consumer performs the task of purchasing vehicles."

41.     From August 2013 through May 2015, Defendants Sripetch, ATG, King Mutual and/or Optimus funded at least 12 fraudulent promotional campaigns of ABBY while ABBY was under the control of Sripetch and Flores.

42.     During the promotional periods, Defendant Williams as well as Defendant entities controlled by Sripetch and/or Flores, specifically DOIT, Doji, King Mutual, Redline and UAIM, dumped ABBY shares into the market demand generated by the fraudulent promotions, for total sale proceeds of over $443,000.

43.     The following paragraphs provide further details concerning some of the 12 occasions on which various combinations of these defendants engaged in the scalping of ABBY shares.

<u>August, September and November 2013</u>

44.     In June 2013, immediately after Flores became CEO of ABBY, over 15 million ABBY shares were deposited into offshore accounts controlled by Flores and Defendant Sripetch, in the names of Defendant entities DOIT, Redline and UAIM.

45.     On August 14, 2013, Defendant ATG (Sripetch and Flores entity) wired $23,000 to a Conduit, with a memo indicating that the wire was "for ABBY Minus 5000 Commission."

46.     On the same day, the Conduit wired $14,500 to three different promoters with an identical memo for each wire indicating that the wires were for "ABBY Advertising."  Newsletters associated with those three promoters began promoting ABBY the next day and continued to promote ABBY until at least August 16, 2013, without disclosing that the funder of the promotions owned ABBY stock and intended to sell the stock during the promotional period.

47.     One of these touts proclaimed, "ABBY is not only getting ready to kick butt in the obstacle racing industry, it is also crushing in the events planning and promotions industry too.  And I don't need to tell you how much that sector is worth because one of the industry's biggest earners is making well over <u>$300 million a year</u>." (Emphasis in original.)

48.     On August 16 and 19, 2013, immediately following the stock promotion, Defendant UAIM sold a total of 1,072,153 shares, through an offshore account, for proceeds of almost $77,000.

49.     On September 11, 2013, Defendant ATG wired the Conduit an additional $35,000." The Conduit then transferred $32,500 to a promoter on September 13, 2013. ATG's wire memo indicated that the payment to the Conduit was for ABBY. On September 15 and 16, 2013, ABBY was promoted through several stock touting newsletters, including Sripetch's own Stockpalooza.com. One promotion stated, "ABBY is a massively undervalued gem with some serious upside potential."

50.     None of these promotions disclosed the funder of the promotions owned ABBY stock and intended to sell the stock during the promotional period.

51.     Immediately after the promotion, on September 16 and 19, 2013, Defendant UAIM sold almost 2.1 million shares of ABBY, through an offshore account, for proceeds of over $63,000. On September 23, 2013, Defendant Redline sold 85,000 shares of ABBY for approximately $2,200.

52.     On November 20, 2013, Defendant King Mutual wired $13,000 to the Conduit, which transferred $11,500 to a promoter later the same day. On November 21 and 22, 2013, newsletters associated with that promoter promoted ABBY. One newsletter stated, "Be prepared, come tomorrow, ABBY looks like it could slingshot upward for gains of the triple digit kind."

53.     Defendant Stockpalooza, Sripetch's own promotion website, also promoted ABBY on November 22, 2013, by publishing an ABBY press release announcing a purported letter of intent to rent space for a promotional tour.  The Stockpalooza newsletter titled, "**Abby Enters Into Letter of Intent With Park It Place USA for Event Space in Albuquerque, NM for Trucks and Tatas Tour Stop 2014**."  The release further explained that "Trucks N Tatas tour is a first of its kind female review show paired with beer, spirits and wine gardens, VIP Cabana lounges and gourmet food trucks that cater to the 21 and over audience."

54.     None of these promotions disclosed that the funder of the promotions owned ABBY stock and intended to sell the stock during the promotional period.

55.     Immediately following these promotions, from November 22 through November 26, 2013, Defendants UAIM and DOIT sold a total of almost 3 million shares of ABBY for proceeds of approximately $43,000.

56.     Proceeds from the above-described ABBY stock sales by Redline and UAIM were wired, at Flores' request to accounts in the names of Defendants ATG, King Mutual and Optimus.  Proceeds from the ABBY sales by DOIT were wired to Defendant Doji and then to ATG.

May 2015

57.     About 18 months later, Sripetch resumed scalping ABBY.  On May 7, 2015, Defendant King Mutual wired $21,000 to the Conduit, which transferred $8,000 to a

promoter later that day.  On May 7 and 8, 2015, newsletters associated with that promoter touted ABBY without disclosing that the funder of the promotions owned ABBY stock and intended to sell the stock during the promotional period.

58.     From May 8 through May 14, 2015, immediately after that promotional campaign, Defendant Williams sold approximately 537,500 shares of ABBY for about $60,000.  On May 8, 2015, Defendant Doji sold 100,000 shares of ABBY for approximately $23,000.

59.     Following each of the ABBY promotions, liquidity of the issuer's stock increased and the stock price rose.

**One Step Vending Corporation Scalping Scheme**

60.     In September 2015, King Mutual purchased over 109,000 shares of One Step Vending Corp. ("One Step Vending") which trades under the ticker symbol KOSK.

61.     On May 28, 2015, defendant Knight converted a note issued by KOSK into equity shares of the company, and subsequently sold the shares to an associate at a significant discount to the then-prevailing market price.

62.     On October 13, 2015, Sripetch transferred $15,000 to the Conduit.  On the same day, the Conduit issued a cashier's check to a promoter.  From October 11 through October 15, 2015, that promoter promoted One Step Vending stock on various newsletters, identifying the Conduit as the funder of the promotional campaign and not

disclosing that the funder of the promotions owned One Step Vending stock and intended to sell the stock during the promotional period.  One newletter promotion stated:

"KOSK is absolute gold at .69 and should be gobbled up ASAP."

Another promotion stated:

"KOSK is poised to capitalize on a vending market set for explosive growth."

63.     From October 12 through October 15, 2015, Defendant King Mutual sold over 111,000 shares of One Step Vending for over $58,000 in proceeds.

64.     On November 12, 2015, Defendant Sripetch wired the Conduit $57,500.  On the same day, the Conduit wired $54,000 to a promoter.  And the next day, a promotion group associated with that promoter began promoting One Step Vending.

65.     From November 13 through December 2, 2015, the associate of Defendant Knight referenced in paragraph 62 sold over 5 million shares of One Step Vending for proceeds of over $493,000.

66.     The associate of Knight who sold the shares of One Step Vending kept approximately $27,000 and wired the remaining proceeds from the sales of One Step Vending shares to defendants Optimus and Orca Bridge.

67.     Neither the October 2015 nor November 2015 promotions disclosed that the funder of the promotions owned One Step Vending stock and intended to sell the stock during the promotional period.

68.     Following each of the One Stop Vending promotions, liquidity of the issuer's stock increased and the share price rose.

**VMS Rehab Systems, Inc. Scalping Scheme Overview**

69.     From February 2016-November 2016, defendant Patel received 12.75 million shares from VMS Rehab Systems, Inc. ("VMS").

70.     Patel received the shares purportedly for legal services rendered to VMS.

71.     Beginning in March 2016, defendants Sripetch and Knight purchased shares of VMS on the open market.

72.     From May 2016 to December 2016, Sripetch, King Mutual and Optimus funded nine promotions of the stock of microcap issuer VMS Rehab, which trades under the symbol VRSYF.

73.     Knight, Patel and Sripetch sold VMS Rehab shares during these promotional periods.  In total, Knight, Patel and Sripetch, received over $1.17 million in proceeds as a result of the scalping activity involved VMS Rehab.

74.     Shortly after selling the VMS stock, Patel sent approximately $583,000 to certain of the corporate defendants.

May-June 2016

75.     The first two of the promotions of VMS Rehab occurred in spring 2016.  On May 24, 2016, Defendant Optimus wired $26,000 to the Conduit.  Later that day, the Conduit wired $23,000 to a promoter.  That same day a promotion of VMS stock began.

76.     On May 24-25, 2016, defendant Patel sold almost 40,000 shares of VMS Rehab for over $78,000.  A week later, Patel wired $48,500 to defendant Orca Bridge.

77.     On June 2, 2016, defendant Sripetch wired $11,500 to the Conduit, which transferred $8,000 to a promoter.  A promotional campaign for VMS Rehab commenced the same day, and continued the following day.  One of the promotional newsletters stated: "[t]his company has been uptrending for a couple months now and appears to be well on its way towards exceeding expectations . . . Logically speaking, with VRSYF pushing forward on the way that it has been, investors won't be far behind in taking advantage."

78.     The next day, on June 3, 2016, defendant Patel sold 5,000 shares of VMS Rehab for $9,450 in proceeds.  On June 13, 2016, Patel wired $8,000 to Orca Bridge.

79.     Neither the May 2016 nor June 2016 promotions of VMS Rehab disclosed that the funder of the promotions owned VMS Rehab stock and intended to sell the stock during the promotional period.

August-September 2016

80.     A few months later, the scalping resumed with two promotions in August and September, 2016.

81.     On August 25, 2016, Optimus wired $32,000 to the Conduit, which wired $27,500 to a promoter later that day.  On August 25 and 26, 2016, newsletters associated with that promoter promoted VMS Rehab.

82.     On August 26, 2016 and September 2, 2016, Patel, Sripetch and Knight sold over 193,000 shares of VMS Rehab for proceeds of over $155,000.  On September 2, 2016, Patel wired $61,500 to Orca Bridge, and on September 12, 2016, Patel wired $28,000 to Orca Bridge.

83.     On September 13, 2016, Optimus wired an additional $22,000 to the Conduit, which wired $20,000 to a promoter the next day.  From September 13 to September 14, 2016, newsletters associated with that promoter began to promote VMS Rehab.  These newsletters did not disclose that the funder of the promotions owned VMS Rehab stock and intended to sell the stock during the promotional period.

84.     From September 13 through September 16, 2016, Patel sold over 687,000 shares of VMS Rehab, for proceeds of over $260,000.  On September 21, 2016, Patel wired $110,000 to Orca Bridge.

October 2016

85.     The scalping of VMS Rehab continued in October 2016.  On October 4, 2016, King Mutual wired $26,000 to the Conduit, which wired $20,000 to a promoter later that day.  The next day, October 5, 2016 newsletters associated with that promoter promoted VMS Rehab, without disclosing that the funder of the promotions owned VMS Rehab stock and intended to sell the stock during the promotional period.

86.     On the day of the promotion, Patel sold over 159,000 shares of VMS Rehab for proceeds of over $46,000, and Knight sold over 11,000 shares of VMS Rehab for

proceeds of approximately $3,700.  Patel also sold a total of approximately 202,000 shares of VMS Rehab on October 14 and October 27, 2016 for proceeds of approximately $27,000.

87.     Further, on October 28, 2016, Optimus wired another $31,000 to the Conduit, which wired a total of $25,000 to two promoters the same day.  Newsletters associated with those promoters began promoting VMS Rehab on October 31, 2016, without disclosing that the funder of the promotions owned VMS Rehab stock and intended to sell the stock during the promotional period.

88.     On October 31, 2016, Patel sold over 711,000 shares of VMS Rehab for proceeds of approximately $120,000.  On November 7, 2016, he wired $80,350 to Orca Bridge.

November-December 2016

89.     The Defendants' scalping of VMS Rehab continued until the end of the year, with three promotional campaigns for VMS Rehab occurring in November and December, 2016.

90.     On November 17, 2016, King Mutual wired the Conduit $44,000, which then wired a total of $40,000 to a promoter later that day.

91.     From November 18 through November 21, 2016, newsletters associated with that promoter promoted VMS Rehab, without disclosing that the funder of the

promotions owned VMS Rehab stock and intended to sell the stock during the promotional period.

92.    From November 18 through December 7, 2016, Patel sold a total of over 1.85 million shares of VMS Rehab, for proceeds of over $168,000.  On December 1, 2016, Patel wired $76,500 to Orca Bridge.

93.    On December 13, 2016, King Mutual wired $22,050 to the Conduit, which wired $20,000 to a promoter the same day.  The following day, a promotional campaign for VMS Rehab commenced, which did not disclose that the funder of the promotions owned VMS Rehab stock and intended to sell the stock during the promotional period.

94.    On December 14 and December 15, 2016, Patel sold over 1.65 million share of VMS Rehab for proceeds of approximately $88,000.

95.    On December 16, 2016, Sripetch wired $36,000 to the Conduit, which wired $27,500 to a promoter on December 19, 2016.  On December 21, 2016, newsletters associated with that promoter promoted VMS Rehab without disclosing that the funder of the promotions owned VMS Rehab stock and intended to sell the stock during the promotional period.

96.    On December 21 and 22, 2016, Patel sold approximately 6.5 million shares of VMS Rehab for proceeds of over $215,361.  On December 23, 2016, Patel wired $56,500 to Orca Bridge and on December 30, 2016, Patel wired $113,500 to Orca Bridge.

97.     In total, Patel sold approximately 11.8 million shares of VMS Rehab for over $1.1 million in proceeds, and sent approximately $582,000 of the proceeds to entities controlled by Sripetch and Knight.

98.     Following each of the VMS Rehab promotions, liquidity of the issuer's stock increased and the share price rose.

99.     None of the newsletters disclosed that the funder of the promotions owned VMS Rehab stock and intended to sell the stock during the promotional period.

**Unregistered Sales of ABBY Securities Through Offshore Accounts**

100.    As mentioned above, since at least June 2013, Flores and Sripetch controlled, or shared common control with, ABBY Inc., a microcap issuer that trades under the symbol ABBY.

101.    On June 5, 2013, ABBY issued a Form 8-K announcing that Flores had become its president, secretary, treasurer, chief financial officer and director.

102.    At about the same time, ABBY issued over 15 million restricted shares, which on the day Flores became CEO were allocated to three Defendant corporations controlled by Flores and Sripetch. UAIM (5.1 million shares); Redline (5 million shares); and DOIT (5 million shares).  These shares were then deposited in offshore brokerage accounts in Belize to accounts in the names of UAIM, Redline and DOIT.

103.    Shortly thereafter, without waiting the required holding period, UAIM, Redline and DOIT sold the shares:

a.  From June 14 through December 6, 2013, UAIM sold these shares, and other shares that it had acquired, for proceeds of almost $220,000.

b.  From September 9, 2013 through February 26, 2014, Redline sold about 4.92 million shares of ABBY for proceeds of about $54,000.

c.  From November 22 through December 16, 2013, DOIT sold 5 million shares for proceeds of over $70,000.

104.  There was no registration statement in effect for any of these sales of ABBY shares.

105.  As alleged above, many of the sales by these entities coincided with promotional campaigns recommending that investors purchase ABBY stock, including three promotions disseminated by Sripetch's own website Stockpalooza.com on September 16, October 14, and November 22, 2013.

106.  During the period that these entities were selling ABBY stock, Flores directed wires of the trading proceeds from the entities' offshore bank accounts to onshore bank accounts controlled by Defendants ATG, Optimus, and King Mutual.

107.  Similarly, during the period in which DOIT was trading ABBY, an associate of Flores directed wires of the trading proceeds from DOIT's offshore bank account to Doji's bank account, from which Doji wired the funds to ATG.

**Additional Unregistered Sales of ABBY Securities to Entities Controlled by Sripetch and Flores**

108.    From November 2013 through November 2016, over 25 million shares of ABBY were issued to various Defendant entities.  The purported basis of these issuances was usually a "promissory note" between the Defendant entity and ABBY or a subsidiary of ABBY.  These promissory notes were illusory, given the common control of ABBY and the Defendant entity.

109.    None of these issuances were registered with the Commission.

110.    Upon receiving these ABBY shares, the entities almost immediately began selling the shares to the public.

111.    The following chart sets forth the issuances of ABBY shares to the Sripetch Network's onshore entities:

| Issuance Date | Entity/Person Receiving Shares | Number of Shares Issued | Selling Period (Proceeds) | Proceeds from the Sales |
|---|---|---|---|---|
| 11/22/2013 | Doji | 5,000,000 | 12/16/2013 - 3/7/2014 | Approx.  $37,000 |
| 10/9/2014 | Williams, as "owner" of Optimus | 1,800,000 | 12/8/2014 - 5/27/2015 | Approx. $269,300 |
| 10/9/2014 | Doji | 2,000,000 | 5/4/2015 - 9/30/2015 | Approx. $37,000 |
| 7/22/2016 | Optimus | 4,985,104 | 10/19/2016 - 10/25/2016 | Approx.  $11,000 |
| 10/27/2016 | Sripetch "dba Redline International" | 5,649,717 | 11/21/2016 - 12/9/2016 | Approx. $7,100 |
| 11/9/2016 | Optimus | 6,374,800 | 12/9/2016 | Approx. $7,400 |

112.    The proceeds of these unregistered sales total approximately $370,000.

**Matched Orders and Wash Trades by Sripetch and Knight**

113.   As noted above, in 2016, certain defendants successfully promoted and sold VMS Rehab, resulting in over $1.1 million dollars in sale proceeds.  The success of this scalping scheme was enhanced by matched and wash trading activity conducted by Defendants Sripetch and Knight.

114.   Throughout 2015 and early 2016, VMS Rehab was thinly traded; from May 2, 2015 through March 2, 2016, there was no trading in VMS Rehab.

115.   Beginning on March 17, 2016 and continuing through June 1, 2016, Sripetch and Knight, and then Knight alone via two separate accounts, engaged in a series of matched orders and wash trades that were intended to, and did, raise the price of VMS Rehab.  These orders were made within minutes, and at times seconds, of each other. Often the trading activity by Sripetch and Knight constituted most, if not all, of the total trading volume of VMS Rehab for that day.

116.   The following chart summarizes this manipulative trading activity in VMS Rehab by Sripetch and Knight:

| Date | Description | Total Daily Volume of VMS Rehab | % of Daily Trading Volume |
|---|---|---|---|
| 3/17/2016 | In three pairs of matched orders, Knight sold a total of 1,600 shares to Sripetch at $1.67/share | 1,600 | 100% |
| 3/21/2016 | In two pairs of matched orders, Knight bought a total of 1,300 shares from Sripetch at $1.70/share | 2,900 | 44.83% |
| 3/22/2016 | In one pair of matched orders, Knight sold 500 shares to Sripetch at $1.73/share | 500 | 100% |
| 3/28/2016 | In one pair of matched orders, Knight sold 500 | 500 | 100% |

| Date | Description | Total Daily Volume of VMS Rehab | % of Daily Trading Volume |
|---|---|---|---|
| | shares to Sripetch at $1.72/share | | |
| 3/29/2016 | In four pairs of matched orders, Knight bought a total of 1,000 shares from Sripetch at $1.74/share and Knight sold 500 shares to Sripetch at $1.73/share | 2,500 | 60% |
| 4/5/2016 | In two pairs of matched orders, Knight sold a total of 500 shares to Sripetch at $1.74/share | 1,000 | 50% |
| 4/12/2016 | In three pairs of matched orders, Knight bought a total of 1,500 shares to Sripetch at $1.75/share | 2,300 | 65.22% |
| 4/29/2016 | In seven pairs of matched orders, Knight sold a total of 1,500 shares to Sripetch at $1.78/share | 2,655 | 56.50% |
| 5/3/2016 | In four pairs of matched orders, Knight bought a total of 1,555 shares from Sripetch at $1.77/share | 1,600 | 97.19% |
| 5/4/2016 | In one pair of matched orders, Knight bought a total of 400 shares from Sripetch at $1.77/share | 500 | 80% |
| 5/18/2016 | In five wash trades, Knight bought and sold 3,500 shares between his two accounts at $1.88/share; and in four match trades, Knight bought a total of 2,000 shares from Sripetch at $1.89/share | 5,500 | 100% |
| 5/19/2016 | In three wash trades, Knight bought and sold 2,500 shares at $1.95/share between his two accounts | 2,500 | 100% |
| 5/20/2016 | In two pairs of matched orders, Knight bought a total of 200 shares from Sripetch at $1.90/share; and in eleven wash trades, Knight bought and sold 3,400 shares between his two accounts at $1.98 to $1.99/share | 4,800 | 75% |
| 5/23/2016 | In three wash trades, Knight bought and sold 1,000 shares between his two accounts at $1.99 to $2.00/share; in three match trades Knight sold a total of 2,000 shares to Sripetch at $1.99 to $2.00/share; and in one match trade Knight purchased 500 shares from Sripetch at $2.05/share | 4,000 | 87.50% |
| 5/25/2016 | In two pairs of matched orders, Knight sold a total of 200 shares to Sripetch at $2.07/share | 100,055 | 0.20% |

| Date | Description | Total Daily Volume of VMS Rehab | % of Daily Trading Volume |
|------|-------------|-------------|----------|
| 6/1/2016 | In one wash trade, Knight bought and sold 100 shares at $2/share between two of his accounts | 4,005 | 2.50% |

Sripetch and Knight engaged in this coordinated trading activity in advance, and at the outset, of a series of promotions funded by the Sripetch Network discussed above, that began on May 24, 2016 and continued through the end of the year. From March 21, 2016 through June 3, 2016, Patel sold 46,593 shares for trading proceeds of $90,163.

**Manipulation of ARGW**

117.    In 2018 through early 2019, Sripetch, Knight, Wexler and McAlpine engaged in a series of manipulations of ARGW stock with the intention of profiting from "pumping and dumping" the stock.

**April-July 2018 ARGW Manipulation**

118.    The scheme began in April 2018, when Sripetch engaged in a series of matched trades in ARGW, using accounts controlled by the Sripetch Network. These trades were designed to create the appearance of active market interest in the stock, upward momentum in the stock price, and on many occasions, to set the closing price of ARGW. This pattern of pre-promotion trading activity, often referred to as "building the chart," is a typical step undertaken by fraudsters prior to a pump and dump.

119.    From May to July, 2018, ARGW was the subject of a promotional campaign funded by the Conduit. These promotional emails touted ARGW as "one company out there focused on high-growth sectors", "making waves in digital, and is slowly building a strong portfolio in the space", "this stock could catapult by up to 155%", "ARGW could be in a position to make a potential run!" "Latest M&A move could send this stock soaring by over 200%!"  These promotions were designed to generate investor demand for ARGW stock, with the aim of increasing the stock's price and liquidity, so that individuals associated with Sripetch could "dump" the stock at a substantial profit. Sripetch's promotions did not disclose that he and his associates intended to sell their ARGW stock.

120.    During this period, Wexler was aware of the promotional campaign, and issued press releases designed to increase investor demand for the stock.

121.    In connection with this scheme, Knight obtained approximately $750,000 in proceeds by selling ARGW from April 19, 2018 to July 9, 2018.  Knight then transferred a portion of the proceeds to Sripetch and a portion of the proceeds to two newly created entities which then transferred the funds, at Wexler's instructions, to a bank account in Canada.

### Fall 2018 ARGW Manipulation

122.    In the fall of 2018, Sripetch, Knight and Wexler engaged in a second scheme to manipulate ARGW.  Sripetch enlisted the efforts of McAlpine in this scheme, who controlled offshore brokerage accounts with which to engage in the manipulative trading.

123.    Wexler made arrangements to have 700,000 shares of ARGW transferred to a brokerage account in the Cayman Islands controlled by McAlpine.

124.    Once the stock was deposited offshore, Wexler, Sripetch, Knight and McAlpine began to execute another ARGW "pump and dump/" Sripetch arranged for a promotional campaign of the stock, to be paid for by the participants in the scheme. Wexler again issued press releases timed to maximize the impact of the stock promotions.

125.    The scheme was thwarted when the promotions caught the attention of OTC Link, which operates as an alternative trading system that displays quotes from broker-dealers for many over-the-counter securities, including ARGW.  OTC Link flagged the stock as being subject to a promotional campaign and displayed a "bullhorn" graphic on its website in connection with ARGW.  As a result of this flag, the brokerage firm used by McAlpine halted its trading in ARGW, and McAlpine was unable to liquidate his position of ARGW.

### December 2018-January 2019 ARGW Manipulation

126.    By late December 2018, McAlpine, Knight, Wexler and Sripetch had decided to pursue another pump and dump of ARGW stock.  The scheme would involve

the same components as the earlier schemes, including coordinated trading activity, and press releases by Wexler opportunistically timed to coincide with promotions coordinated by Sripetch.

127.    As a first step, Sripetch and McAlpine engaged in a series of cross-trades in order to "repatriate" the ARGW stock into a domestic account of Sripetch and away from the offshore broker-dealer, which had apparently become more vigilant in policing suspicious microcap activity.  The parties believed that, in light of the promotion flag on the OTC Markets website, they could more easily get shares into the U.S. account by purchasing the shares in the market rather than by attempting to deposit newly issued shares.  An additional benefit of trading the shares into domestic accounts was an increase in trading volume in ARGW.

128.    While the stock was being traded from the offshore accounts into domestic accounts, Wexler coordinated with Sripetch to ensure that the company would issue press releases that coincided synergistically with the trading.

129.    Sripetch then arranged for a promotional email campaign that ran on Sunday, February 3, and Monday, February 4, 2019.  None of the promotional emails disclosed that Sripetch and his cronies also owned shares of ARGW that they planned to, and did, sell.

130.    On February 4, 2019 - the first trading day after the commencement of Sripetch's promotional campaign - ARGW's price opened at $1.43, and the volume rose

to 578,555 shares.  Sripetch sold 193,950 shares of ARGW at prices ranging from $0.60 to $1.02 for proceeds of $119,901.  In addition, as it turned out, McAlpine was able to sell some of the ARGW shares still held offshore, selling 155,000 shares of ARGW at $0.6129, for approximate proceeds of $94,618.

131.    The Commission suspended trading in ARGW the following day.  The suspension thwarted the parties' intent to dump their remaining shares.

### FIRST CLAIM FOR RELIEF
**Violations of Section 10(b) of theExchange Act and Rule 10b-5(a) and 10b-5(c)**
**(Against Defendants Flores, Knight, Sripetch, McAlpine, Wexler and the Entity Defendants)**

132.    Paragraphs 1-7, 15-99, and 113-131 are re-alleged and incorporated by reference as if fully set forth herein.

133.    Flores, Knight, Sripetch, McAlpine, Wexler, Adtron, ATG, DOIT, Doji, King Mutual, Optimus, Orca Bridge, Redline and UAIM, directly or indirectly, singly or in concert, knowingly or recklessly, by the use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, employed devices, schemes and artifices to defraud, and engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon purchases of securities or upon other persons.

134.    By reason of the foregoing, these Defendants, singly or in concert, directly or indirectly, violated and, unless enjoined, will again violate, Section 10(b) of the

Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

## SECOND CLAIM FOR RELIEF
### Violations of Section 10(b) of the
### Exchange Act and Rule 10b-5(b)
### (Against Defendants Adtron and Sripetch)

135.   Paragraphs 1-7, 15, 22, 31-99, and 113-131 are re-alleged and incorporated by reference as if fully set forth herein.

136.   Defendants Adtron and Sripetch, directly or indirectly, singly or in concert, knowingly or recklessly, by the use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, knowingly or recklessly, made untrue statements of material fact and have omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

137.   By reason of the foregoing, Defendants Adtron and Sripetch, singly or in concert, directly or indirectly, violated and, unless enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

## THIRD CLAIM FOR RELIEF
### Violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act
### (Against Defendants Flores, Knight, Sripetch, McAlpine, Wexler and the Entity
### Defendants)

138.    Paragraphs 1-7, 15-99, and 113-131 are re-alleged and incorporated by reference as if fully set forth herein.

139.    Defendants Flores, Knight, Sripetch, McAlpine, Wexler, Adtron, ATG, DOIT, Doji, King Mutual, Optimus, Orca Bridge, Redline and UAIM, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly: employed devices, schemes or artifices to defraud; and engaged in transactions, practices or courses of business which operate or would operate as a fraud or deceit upon a purchaser.

140.    By reason of the conduct described above, these Defendants, directly or indirectly, violated, and, unless enjoined, will again violate, Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)].

### FOURTH CLAIM FOR RELIEF
**Violations of Section 17(a)(2) of the Securities Act**
**(Against Defendants Adtron and Sripetch)**

141.    Paragraphs 1-7, 15, 22, 31-99, and 113-131 are re-alleged and incorporated by reference as if fully set forth herein.

142.    Defendants Adtron and Sripetch, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly obtained money or property by means of an untrue statement of a material fact or omitted to state a material fact necessary in order to

make the statements made, in light of the circumstances under which they were made, not misleading.

143.   By reason of the conduct described above, these Defendants directly or indirectly, violated, and, unless enjoined, will again violate, Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

**FIFTH CLAIM FOR RELIEF**
**Aiding and Abetting Violations of Section 10(b) of the Exchange Act**
**and Rule 10b-5(a) and 10b-5(c)**
**(Against Patel)**

144.   Paragraphs 1-7, 19, 31-38, and 69-99 are re-alleged and incorporated by reference as if fully set forth herein.

145.   Defendant Patel , directly or indirectly, singly or in concert, knowingly or recklessly, by the use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, employed devices, schemes and artifices to defraud, and engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon purchases of securities or upon other persons.

146.   Patel, directly or indirectly, provided knowing and substantial assistance to persons who, directly or indirectly, singly or in concert, knowingly or recklessly, by the use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, employed devices, schemes and artifices to defraud, and engaged in acts,

practices and courses of business which operated or would have operated as a fraud or deceit upon purchases of securities or upon other persons.

147.    By virtue of the foregoing, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Patel aided and abetted, and, unless restrained and enjoined, will continue to aid and abet, violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

## SIXTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Section 17(a)(1) and (3) of the Securities Act
### (Against Patel)

148.    Paragraphs 1-7, 19, 31-38, and 69-99 are re-alleged and incorporated by reference as if fully set forth herein.

149.    Defendant Patel, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in the offer or sale of securities: with scienter, employed devices, schemes, or artifices to defraud; or engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers.

150.    Patel, directly or indirectly, provided knowing and substantial assistance to persons who directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in the offer or sale of securities, with scienter: employed devices, schemes, or artifices to defraud; or engaged in transactions, practices, or courses of business which operated or

would operate as a fraud or deceit upon the purchasers.

151.    By virtue of the foregoing, pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)], Patel aided and abetted, and, unless restrained and enjoined, will continue to aid and abet, violations of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)].

### SEVENTH CLAIM FOR RELIEF
### Violations of Sections 5(a) and 5(c) of the Securities Act
### (Against Defendants Flores, Sripetch, Williams, DOIT, Doji, Optimus, Redline and UAIM)

152.    Paragraphs 5, 15-16, 21, 24-25, 27, 29-30, and 100-112, are re-alleged and incorporated by reference as if fully set forth herein.

153.    The ABBY stock that these Defendants sold into the market constitute securities within the meaning of Securities Act Section 2(a)(1), 15 U.S.C. § 77b(a)(1), and Exchange Act Section 3(a)(10), 15 U.S.C. § 15 U.S.C. § 78c(a)(10).

154.    These Defendants, directly or indirectly, singly or in concert with others, made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer and sell securities when no registration statement had been filed or was in effect as to such offers and sales of such securities and no exemption from registration was available.

155.    By virtue of the foregoing, these Defendants violated and, unless restrained and enjoined, will continue violating, Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) & (c)].

### EIGHTH CLAIM FOR RELIEF
### Violations of Sections 9(a)(1) of the Exchange Act
### (Against Defendants Knight and Sripetch)

156.    Paragraphs 6-7, 15, 17, and 113-131 are re-alleged and incorporated by reference as if fully set forth herein.

157.    From at least March 2016 through June 2016, Defendants Knight and Sripetch, directly or indirectly, with scienter, by the use of the mails or any means or instrumentality of interstate commerce, for the purpose of creating a false or misleading appearance of active trading in VSRYF securities, or a false or misleading appearance with respect to the market for any such security, have (a) entered an order or orders for the purchase of any such security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale of any such security, has been or will be entered by or for the same or different parties; or (b) entered an order or orders for the sale of any such security with the knowledge that an order or orders of substantially the same size, at substantially the same time,  and at substantially the same price, for the sale of any such security, has been or will be entered by or for the same or different parties, or (c) to enter any order or orders for the sale of any such security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of such security, has been or will be entered by or for the same or different parties.

158.    By reason of the foregoing, Defendants Knight and Sripetch violated, and unless restrained and enjoined, will continue violating, Section 9(a) of the Exchange Act [15 U.S.C. § 78i(a)].

### NINTH CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Thereunder, Pursuant to Section 20(b) of the Exchange Act
### (Defendants Sripetch and Flores)

159.    Paragraphs 1-7, 15-16, and 15-99 are re-alleged and incorporated by reference as if fully set forth herein.

160.    Section 20(b) of the Exchange Act [15 U.S.C. § 78t(b)]  precludes any person, directly or indirectly, from doing any act which would be unlawful under the Exchange Act for such person to do, through or by means of any other person.

161.    By knowingly or recklessly using third-party promoters to promote various microcap stock without disclosing their beneficial ownership, intent to sell, and/or sales of the stock, Sripetch and Flores, directly or indirectly, violated Section 20(b) of the Exchange Act.  These acts, done through and by the means of the third-party promoters violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and  Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

162.    By reason of the foregoing, Defendants Knight and Sripetch violated, and unless restrained and enjoined, will continue violating Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)]  and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(a) and (c)], pursuant to Section 20(b) [15 U.S.C. §78t(b)]  .

### **PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests a Final Judgment:

A.     Finding that the Defendants violated the securities laws and rules promulgated thereunder as alleged against them herein;

B.     Permanently restraining and enjoining Defendants from violating, directly and indirectly, the securities laws and rules promulgated thereunder that they are alleged to have violated;

C.     Ordering Defendants to disgorge all ill-gotten gains that they obtained as a result of the conduct alleged herein, and to pay prejudgment interest thereon;

D.     Ordering Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

E.     Prohibiting Defendants, pursuant to Section 21(d)(6)(A) of the Exchange Act [15 U.S.C. § 78u(d)(6)(A)] from participating in an offering of penny stock;

F.     Permanently barring Defendants Flores and Knight from acting as an officer or director of any public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; and

G.     Granting such other and further relief as the Court may deem just and proper.

Dated: September 21, 2020

Respectfully submitted,

/s/ Christopher J. Dunnigan

Richard R. Best
Lara Shalov Mehraban
Michael Paley
Christopher J. Dunnigan
(*Appearing Pursuant to
Local Civil Rule 83.3(c)(3)*)
Kristine Zaleskas
(*Appearing Pursuant to
Local Civil Rule 83.3(c)(3)*)
SECURITIES AND
EXCHANGE
COMMISSION
Brookfield Place
200 Vesey Street, Suite 400
New York, NY 10281
Telephone: 212-336-0061
(Dunnigan)