# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                               Plaintiff,<br><br>v.<br><br>ONGKARUCK SRIPETCH; AMANDA FLORES; BREHNEN KNIGHT; ANDREW MCALPINE, ASHMIT PATEL; MICHAEL WEXLER; DOMINIC WILLIAMS; ADTRON INC. a/k/a STOCKPALOOZA.COM; ATG INC.; DOIT, LTD.; DOJI CAPITAL, INC.; KING MUTUAL SOLUTIONS INC.; OPTIMUS PRIME FINANCIAL INC.; ORCA BRIDGE; REDLINE INTERNATIONAL; and UAIM CORPORATION,<br><br>                               Defendants. | Case No.: 20-cv-01864-H-AGS<br><br>**ORDER:**<br><br>**(1) GRANTING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION; AND**<br><br>[Doc. No. 6.]<br><br>**(2) GRANTING JOINT REQUEST FOR ENTRY OF AN ORDER MODIFYING THE PRELIMINARY INJUNCTION**<br><br>[Doc. Nos. 19, 26-1.] |

On September 22, 2020, Plaintiff Securities and Exchange Commission filed an ex parte motion for a temporary restraining order against Defendants Ongkaruck Sripetch, Brehnen Knight, Ashnmit Patel, and Amanda Flores. (Doc. No. 6.) On September 22,

2020, the Court held a telephonic hearing on Plaintiff's motion for a TRO, and the Court granted Plaintiff's motion and entered the requested TRO.[1] (Doc. Nos. 11, 12.)

The Court held an order to show cause hearing on October 5, 2020. (Doc. No. 16.) Following the hearing: (1) the Court temporarily granted the SEC's motion for a preliminary injunction; (2) the Court converted the September 22, 2020 TRO into a preliminary injunction; and (3) the Court scheduled a further hearing on the SEC's motion for a preliminary injunction. (Doc. No. 17.)

On October 9, 2020, Defendants Sripetch and Flores filed a motion to modify the preliminary injunction. (Doc. No. 19.) On October 30, 2020, the SEC filed a response to Defendants Sripetch and Flores's motion for modification of the injunction. (Doc. No. 26.) In the filing, the SEC explains that it and Defendants Sripetch and Flores have reached an agreement to resolve the asset freeze issues raised in Defendants' motion for modification. (Id.) Along the filing, the SEC submitting a joint proposed modification order from itself and Defendant Sripetch. (Doc. No. 26-1.)

On November 30, 2020, the Court vacated the further hearing on the SEC's motion for a preliminary injunction. (Doc. No. 27.) For the reasons below, the Court grants Plaintiff SEC's motion for a preliminary injunction, and the Court grants Plaintiff SEC and Defendant Sripetch's joint request for entry of an order modifying the preliminary injunction.

## BACKGROUND

On September 21, 2020, Plaintiff SEC initiated the present action against Defendants Ongkaruck Sripetch, Amanda Flores, Brehnen Knight, Andrew McAlpine, Ashmit Patel, Michael Wexler, and Dominic Williams ("the Individual Defendants") and against Defendants Adtron Inc. aka Stockpalooza.com, ATG Inc., DOIT Ltd., Doji Capital, Inc., King Mutual Solutions Inc., Optimus Prime Financial Inc., Orca Bridge, Redline

---

[1] On September 30, 2020, counsel for Plaintiff SEC filed a declaration stating that Defendants Sripetch, Flores, Knight, and Patel were served with copies of the TRO, the complaint, and the motion for a TRO via email and UPS/Federal Express. (Doc. No. 13, Dunningan Decl. ¶ 6.)

International, and UAIM Corporation ("the Entity Defendants"). The SEC alleges that, from at least August 2013 through at least February 2019, the Defendants worked as a network to engage in stock "scalping" schemes to manipulate the common stock of at least 20 companies. "Scalping" is "a known practice whereby the owner of shares of a security recommends that security for investment and then immediately sells it at a profit upon the rise in the market price which follows the recommendation." SEC v. Abellan, 674 F. Supp. 2d 1213, 1219 (W.D. Wash. 2009); see Lowe v. SEC, 472 U.S. 181, 224 (1985) (White, J., concurrence) (describing "scalping" as where "a person associated with an advisory service 'purchas[es] shares of a security for his own account shortly before recommending that security for long-term investment and then immediately sell[s] the shares at a profit upon the rise in the market price following the recommendation.'" (quoting SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 181 (1963))).

In each of the alleged schemes, a subset of the Defendants would begin by obtaining stock in a certain microcap company that is thinly traded,[2] and they would usually hold that stock in the name of one of the Entity Defendants. (Doc. No. 1, Compl. ¶¶ 31-32; Doc. No. 6-1 at 2.) Next, some of the Defendants would promote the company at issue. (Id.) In most instances, a Defendant or Defendants paid an intermediary entity, which then wired the funds, minus a commission, to third-party promoters who would run promotional campaigns for the stock. (Id.) In some instances, Defendant Adtron – a company owned and controlled by Defendant Sripetch – would also conduct a promotional campaign. (Id.) Then, shortly after the beginning of the promotional campaign, Defendants would sell, or "dump," the relevant stock at inflated prices caused by the promotions. (Id.) Plaintiff SEC asserts that these practices mislead the public and constitute illegal "scalping" that violates certain anti-fraud provisions of the federal securities laws. (Doc. No. 6-1 at 2; Doc. No. 1, Compl. ¶ 33.)

---

[2] "Microcap stocks are defined based on the market capitalization of the issuer; these stocks tend to have a share price of less than one cent." SEC v. Alpine Sec. Corp., 354 F. Supp. 3d 396, 406 (S.D.N.Y. 2018).

On September 21, 2020, Plaintiff SEC filed a complaint against Defendants Sripetch, Flores, Knight, McAlpine, Patel, Wexler, Williams, Adtron, ATG, DOIT, Doji, King Mutual, Optimus Prime, Orca Bridge, Redline, and UAIM, alleging various claims for: violations of Sections 9(a) and 10(b) of the Exchange Act; violations of Sections 5(a), 5(c), and 17(a) of the Securities Act; violations of Rule 10b-5; and aiding and abetting violations of those provisions. (Doc. No. 1.) On September 22, 2020, Plaintiff SEC filed an ex parte motion for a temporary restraining order against Defendants Sripetch, Knight, Patel, and Flores. (Doc. No. 6.) On September 22, 2020, the Court granted Plaintiff's motion and entered the requested TRO. (Doc. No. 12.) On October 5, 2020, the Court temporarily granted the SEC's motion for a preliminary injunction, and the Court converted the September 22, 2020 TRO into a preliminary injunction. (Doc. No. 17.)

By the present motion, Plaintiff SEC moves for a preliminary injunction. (Doc. No. 6.) Specifically, the SEC requests an order enjoining and restraining Defendants Sripetch, Knight, Patel, and Flores from violating the antifraud provisions of the securities laws and prohibiting them from destroying documents. (Id. at 1.) In addition, the SEC requests: (1) an asset freeze in the amount of $979,473.12 and an accounting as to Sripetch; and (2) an asset freeze in the amount of $1,051,612.60 and an accounting as to Patel.[3] (Id.) In addition, Plaintiff SEC and Defendant Sripetch jointly request that the Court enter their joint proposed order to modify the preliminary injunction. (Doc. No. 26-1.)

///
///
///

---

[3] In its motion for a TRO, the SEC requested an asset freeze as to Defendant Knight in the amount of $687,032.27 and an accounting. (Doc. No. 6 at 1.) The Court granted this request and included this specific relief in the TRO. (Doc. No. 12.) At the October 5, 2020 order to show cause hearing, the SEC requested that the asset freeze be lifted as to Defendant Knight. (Doc. No. 17.) The Court granted the SEC's further request and lifted the asset freeze as to Knight. (Id.)

# DISCUSSION

## I. Legal Standard

A preliminary injunction is "an extraordinary remedy at may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008). It is "a device for preserving the status quo and preventing the irreparable loss of rights before judgment." Sierra On-Line, Inc. v. Phoenix Software, Inc., 739 F.2d 1415, 1422 (9th Cir. 1984). A district court may enter a preliminary injunction only "upon a clear showing that the plaintiff is entitled to such relief." Winter, 555 U.S. at 22; see also Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cty., 415 U.S. 423 (1974) (explaining that the party seeking the preliminary injunction "bears the burden of demonstrating the various factors justify[] preliminary injunctive relief"). "The grant or denial of a motion for a preliminary injunction lies within the discretion of the district court." Johnson v. California State Bd. of Accountancy, 72 F.3d 1427, 1429 (9th Cir. 1995).

In a typical case, "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter, 555 U.S. at 20. Nevertheless, "[b]ecause the SEC is a governmental agency acting as a 'statutory guardian charged with safeguarding the public interest in enforcing the securities laws,'" in evaluating a motion for a preliminary injunction by the SEC, courts employ "a two part factor test requiring the SEC to show '(1) a prima facie case of previous violations of federal securities laws, and (2) a reasonable likelihood that the wrong will be repeated.'" SEC v. Blockvest, LLC, No. 18CV2287-GPB(BLM), 2019 WL 625163, at *4 (S.D. Cal. Feb. 14, 2019) (quoting SEC v. Mgmt. Dynamics, Inc., 515 F.2d 801, 808 (2d Cir. 1975); SEC v. Unique Fin. Concepts, Inc., 196 F.3d 1195, 1199 n. 2 (11th Cir. 1999)); see, e.g., SEC v. Schooler, 902 F. Supp. 2d 1341, 1344 (S.D. Cal. 2012) (applying the two-part test); SEC v. Muehler, No. 218CV01677CASSKX, 2018 WL 1665637, at *5 (C.D. Cal. Apr. 4, 2018) (same); SEC v.

San Francisco Reg'l Ctr. LLC, No. 17-CV-00223-RS, 2017 WL 1092315, at *2 (N.D. Cal. Mar. 23, 2017) (same); SEC v. Capital Cove Bancorp LLC, No. SACV15980JLSJCX, 2015 WL 9704076, at *5–6 (C.D. Cal. Sept. 1, 2015) (same); SEC v. Path Am., LLC, No. C15-1350JLR, 2015 WL 13866539, at *6 (W.D. Wash. Oct. 6, 2015) (same); see also SEC v. United Fin. Grp., Inc., 474 F.2d 354, 358 (9th Cir. 1973) ("A prima facie case of the probable existence of fraud and mismanagement was demonstrated by the SEC. Such a showing is sufficient to call into play the equitable powers of the court." (footnote omitted)).

**II.   Analysis**

    A.   <u>Whether the SEC Has Established a Prima Facie Case of Violations of Federal Securities Laws</u>

        i.   <u>Claims for Violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rules 10b-5(a) and (c) against Sripetch, Flores, and Knight</u>

Plaintiff SEC alleges claims against Defendants Sripetch, Flores, and Knight for violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b–5. (Doc. No. 1, Compl. ¶¶ 132-43; see Doc. No. 6-1 at 19-21.) "Section 17(a) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b–5, prohibit fraudulent conduct or practices in connection with the offer or sale of securities." SEC v. Dain Rauscher, Inc., 254 F.3d 852, 855 (9th Cir. 2001). "These antifraud provisions prohibit schemes to defraud, and they prohibit 'making a material misstatement or omission in connection with the offer or sale of a security by means of interstate commerce.'" SEC v. Stein, 906 F.3d 823, 830 (9th Cir. 2018) (quoting Dain Rauscher, 254 F.3d at 855–56). Thus, liability under these provisions requires evidence of: (1) a material misrepresentation or omission; (2) in connection with the purchase or sale of a security; (3) with scienter; and (4) by means of interstate commerce. SEC v. Todd, 642 F.3d 1207, 1215 (9th Cir. 2011); Dain Rauscher, 254 F.3d at 855–56.

"For a misrepresentation to be material, 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" Todd, 642 F.3d at 1215 (quoting Basic Inc. v. Levinson, 485 U.S. 224, 231–32 (1988)). Turning to scienter, "[s]cienter is 'a mental state embracing intent to deceive, manipulate, or defraud.'" SEC v. Rubera, 350 F.3d 1084, 1094 (9th Cir. 2003) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n. 12 (1976)). "Reckless conduct may also constitute scienter." Todd, 642 F.3d at 1215. "Reckless conduct is a highly unreasonable act or omission that is an 'extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" Id. (quoting (citing Dain Rauscher, 254 F.3d at 856)).

Here, the SEC asserts that Defendants Sripetch, Flores, and Knight violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b–5 by engaging in an illegal stock "scalping" scheme. (Doc. No. 6-1 at 19-22.) "Scalping" is the "practice whereby the owner of shares of a security recommends that security for investment and then immediately sells it at a profit upon the rise in the market price which follows the recommendation." Abellan, 674 F. Supp. 2d at 1219.

The evidence in the record shows that from 2013 to 2019, Defendants Sripetch, Flores, and Knight engaged in over twenty stock scalping schemes. During this period, Defendant Sripetch either directly or through one of the Entity Defendants under his control (Adtron, King Mutual, or Optimus Prime (which he controlled with Flores)) paid stock promoters to run promotional campaigns for certain stocks. (Doc. No. 6-3, Tong Decl. ¶¶ 9, 13, 20, Ex. N; see also Doc. No. 6-1 at 6-8.) During some of these campaigns, Defendants Sripetch, Flores, and Knight also directly promoted the stock through Stockpalooza.com, which was owned and controlled by Sripetch via Adtron. (Doc. No. 6-3, Tong Decl. ¶¶ 18-19, Ex. P.) Then, during these promotional campaigns, Defendants Sripetch, Flores, and Knight, either directly or indirectly through one of the Entity

Defendants would sell shares of the relevant stocks at inflated prices. (See id. ¶ 9, Ex. N; see also Doc. No. 6-1 at 6-8.)

The SEC argues that these facts are sufficient to establish a prima facie case for violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b–5. The Court agrees.

As to the "material misrepresentation or omission" element, for each of the schemes, Defendant Sripetch either directly or through one of the Entity Defendants under his control (Adtron, King Mutual, or Optimus Prime (which he controlled with Flores)) paid stock promoters to run promotional campaigns for certain stocks. (Doc. No. 6-3, Tong Decl. ¶¶ 9, 13, 20, Ex. N; see also Doc. No. 6-1 at 6-8.) These promotional campaigns either: (1) were silent on whether the funder of the promotion intended to sell his shares in the companies' stock; or (2) made statements such as "the third party may have shares and may liquidate it, which may negatively affect its stock price" or "the third party . . . could very well be selling shares of the companies' stock at the same time the profile is being disseminated to potential investors." (Doc. No. 6-3, Tong Decl. ¶ 22.) In addition, during some of these campaigns, Defendants Sripetch, Flores, and Knightly also directly promoted the stock at issue through Stockpalooza.com, which was owned and controlled by Sripetch. (Id. ¶¶ 18-19, Ex. P.) The Stockpalooza.com promotional materials stated that "[w]hen Stockpalooza.com receives free or restricted shares as a compensation for a profiled company, Stockpalooza.com may sell part of all of such shares during the period in which Stockpalooza.com is performing such services." (Id. ¶ 21, Ex. P.)

The SEC contends that these statements and omissions are misleading because they did not fully disclose the Defendants' then-present intent, as the promotions' ultimate funders, to sell the promoted stock. (Doc. No. 6-1 at 10-12, 19-20.) The Court agrees that the statements and omissions in the promotions at issue are sufficient to satisfy the "material misrepresentation or omission" element. See, e.g., SEC v. Recycle Tech, Inc., No. 12-21656-CIV, 2013 WL 12063952, at *5 (S.D. Fla. Sept. 26, 2013) (finding a complaint sufficiently identified material misrepresentations and omissions and noting that

"[w]hile the newsletters stated that Defendants 'may sell part or all' of its Recycle Tech stock, they failed to disclose that they were definitively selling Recycle Tech shares immediately after issuing the newsletters promoting the stock"); SEC v. Corp. Relations Grp., Inc., No. 6:99CV1222ORL28KRS, 2003 WL 25570113, at *8 (M.D. Fla. Mar. 28, 2003) ("[T]he 'from time to time' language is inadequate to convey the reality of the Veitia Defendants' stock sales, which were intentionally timed rather than coincidental with the publications."); Abellan, 674 F. Supp. 2d at 1219 ("Scalping . . . constitutes fraud or deceit for purposes of establishing violation of the Exchange Act."); Zweig v. Hearst Corp., 594 F.2d 1261, 1266–67 (9th Cir. 1979), abrogated on other grounds by Hollinger v. Titan Capital Corp., 914 F.2d 1564 (9th Cir. 1990). In addition, the Court notes that it is of no consequence that some of the statements or omission were made by third parties because Defendant Sripetch either directly or through one of the Entity Defendants paid those third parties to make the statements and omissions at issue. See Janus Capital Grp., Inc. v. First Derivative Traders, 564 U.S. 135, 142 (2011) ("For purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it.").

As to the "in connection with" element, the misrepresentations and omissions at issue were made during promotional campaigns that recommended the purchase of certain stocks. This is sufficient to satisfy the "in connection with" element. See Corp. Relations Grp., 2003 WL 25570113, at *9 ("[T]he Veitia Defendants' omission of material information was 'in connection with' the purchase or sale of securities. The Veitia Defendants were acquiring stock and then selling that stock while recommending that their readers purchase those same stocks."); SEC v. Blavin, 557 F. Supp. 1304, 1310–11 (E.D. Mich. 1983) ("Nor can there be any dispute that the statements were made in connection with the purchase and sales of securities. The sole purpose of the newsletters was to recommend the purchase of certain stock, which was exactly the same stock that Blavin was contemporaneously buying and selling.").

As to the "scienter" element, Defendants Sripetch, Flores, and Knight's repeated pattern over a six-year period of acquiring stock in a company, followed by paying for the promotion of that stock, and then selling that stock at a profit demonstrates at least reckless intent and is sufficient to satisfy the scienter element. See, e.g., Corp. Relations Grp., 2003 WL 25570113, at *9 ("The Veitia Defendants' repeated pattern of purchasing the securities of fourteen companies over a two-year period followed by touting and sales at a tremendous profit shows repeated, willful activity. . . . The Defendants' scalping practice—the acquisition of stock, followed by touting of that stock in an effort to drive up the price, followed by a sale of that stock at a substantial profit—shows an intent to manipulate the market in a manner proscribed by the securities laws."); Recycle Tech, 2013 WL 12063952, at *6 ("Defendants' acts of selling their Recycle Tech stock directly contradicted their recommendation to investors to purchase Recycle Tech stock. This establishes scienter."); Abellan, 674 F. Supp. 2d at 1219 ("Scienter is . . . evident where persons engage in 'scalping.'"); Blavin, 760 F.2d at 712 ("At a minimum, Blavin recklessly failed to disclose that he was trading in stocks that his newsletter recommended . . . .").

Finally, as to the "interstate commerce" element, the misrepresentations at issue were made via email over the internet. This is sufficient to satisfy the "interstate commerce" element. See, e.g., Recycle Tech, 2013 WL 12063952, at *7 (finding the "interstate commerce" element satisfied where the representations at issues were made through the internet); see also SEC v. Levin, No. 12-21917-CIV, 2013 WL 594736, at *12 (S.D. Fla. Feb. 14, 2013) ("[T]he Internet, which necessarily includes email, is an 'instrumentality of interstate commerce.'"). In sum, the SEC has demonstrated a prima facie case against Defendants Sripetch, Flores, and Knight for violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b–5.

    ii. <u>Claim for Violation of Section 9(a) of the Exchange Act against Sripetch and Knight</u>

Plaintiff SEC also alleges a claim against Defendants Sripetch and Knight for violation of Section 9(a)(1) of the Exchange Act. (Doc. No. 1, Compl. ¶¶ 156-58; see Doc.

No. 6-1 at 22-23.) "Section 9(a)(1) explicitly forbids several common types of market manipulation, known as matched orders and wash sales, that involve fictitious transactions and do not result in any change of beneficial ownership." SEC v. Masri, 523 F. Supp. 2d 361, 366 (S.D.N.Y. 2007) (footnotes omitted); see 15 U.S.C. 78i(a)(1); Ernst & Ernst v. Hochfelder, 425 U.S. 185, 205 n.25 (1976). "In order '[t]o make out a violation of subsection 9(a)(1) . . . , a plaintiff must prove the existence of (1) a wash sale or matched orders in a security [,] (2) done with scienter [and] (3) for the purpose of creating a false or misleading appearance of active trading in that security . . . .'" SEC v. Malenfant, 784 F. Supp. 141, 144 (S.D.N.Y. 1992) (quoting Chemetron Corp. v. Bus. Funds, Inc., 682 F.2d 1149, 1163 (5th Cir. 1982)); accord SEC v. Competitive Techs., Inc., No. CIV.A.3:04CV1331(JCH, 2005 WL 1719725, at *6 (D. Conn. July 21, 2005); see AnchorBank, FSB v. Hofer, 649 F.3d 610, 616 (7th Cir. 2011).

"'Wash' sales are transactions involving no change in beneficial ownership." Hochfelder, 425 U.S. at 205 n.25. "'Matched' orders are orders for the purchase sale of a security that are entered with the knowledge that orders of substantially the same size, at substantially the same time and price, have been or will be entered by the same or different persons for the sale/purchase of such security." Id.; see SEC v. Kwak, No. CIVA 304-CV-1331 JCH, 2008 WL 410427, at *1 (D. Conn. Feb. 12, 2008) ("A matched trade takes place when a person buys or sells a stock, with knowledge that a substantially offsetting transaction is going to be entered into by someone, in order to mislead others about the extent of the activity in, or the market for, a given stock.").

The evidence in the record shows that Sripetch and Knight engaged in several matched orders and washed trades in VMS stock in advance of implementing a stock scalping scheme for that stock. (Doc. No. 6-3, Tong Decl. ¶¶ 9, 27, Ex. N.) Specifically, the evidence shows that between March 17, 2016 and May 25, 2016, Sripetch and Knight sold large volumes of VMS stock back and forth to each other while raising the prices of the orders over time from $1.67 per share to $2.07 per share during this period. (Id. ¶ 27.) The evidence also shows that during this period, Knight engaged in several wash trades

where he sold shares of VMS between two accounts that he owned at increasing prices. (Id.)  For many of the days during this period, Sripetch and Knight's trades represented 100% of the total daily reported trading volume for VMS. (Id.)  Further, at the conclusion of this period, in May-June 2016 and August-December 2016, Sripetch and Knight engaged in a stock scalping scheme with VMS stock.  (See id. ¶ 9, Ex. N.)

This evidence is sufficient to demonstrate a prima facie case against Defendants Sripetch and Knight for violation of Section 9(a)(1).  The evidence shows that Defendants Sripetch and Knight engaged in several matched orders and washed trades.  Further, the timing and frequency of these manipulative trades is sufficient to demonstrate scienter and that these trades were done for the purposes of creating the false or misleading appearance of trading in VMS.  In sum, the SEC has demonstrated a prima facie case against Defendants Sripetch and Knight for violation of Section 9(a)(1) of the Exchange Act.

      iii. Claim for Aiding and Abetting Securities Fraud Against Patel

Plaintiff SEC alleges claims against Defendant Patel for aiding and abetting violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b–5. ((Doc. No. 1, Compl. ¶¶ 144-51; see Doc. No. 6-1 at 23-24.)  To establish a claim for aiding and abetting securities fraud, the SEC must demonstrate:  "(1) the existence of an independent primary wrong, (2) actual knowledge or reckless disregard by the alleged aider and abettor of the wrong and of his or her role in furthering it, and (3) substantial assistance in the wrong."  Levine v. Diamanthuset, Inc., 950 F.2d 1478, 1483 (9th Cir. 1991); see Ponce v. SEC, 345 F.3d 722, 737 (9th Cir. 2003).  "The element of substantial assistance is met when, based upon all the circumstances surrounding the conduct in question, an individual's actions are a 'substantial causal factor' in bringing about the primary violation."  SEC v. Hurd, No. CV1304464RGKJCGX, 2014 WL 12561073, at *6 (C.D. Cal. Feb. 21, 2014) (citing Rolf v. Blyth, Eastman Dillon & Co., Inc., 570 F.2d 38, 48 (2d Cir. 1978)).

The evidence in the record shows that Defendant Patel held brokerage accounts in his name that sold stocks in many of the stock scalping schemes conducted by the other

Defendants. (Doc. No. 6-3, Tong Decl. ¶¶ 8, 9, 17, 29, Ex. N.) The evidence further shows that following these sales, Patel would remit over 50% of the proceeds to the stock sales to accounts owned by entities that were controlled by Sripetch, Flores, and/or Knight. (See id. ¶ 29 (showing $919,050 remitted to Orca Bridge, $23,700 remitted to King Mutual, and $67,067 remitted to Optimus Prime).

This evidence is sufficient to demonstrate a prima facie case of aiding and abetting against Defendant Patel. As to the first element, the SEC has demonstrated a prima facie case that Defendants Sripetch, Flores, and Knight engaged in various stock scalping schemes in violation of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b–5. See supra. As to the second element, Patel's sale of stocks and sharing of profits during those stock scalping schemes is sufficient to constitute "substantial assistance" to Defendants Sripetch, Flores, and Knight's violations of the securities laws. As to the third element, the Court agrees with the SEC that this evidence is also sufficient to establish Patel's scienter. The SEC notes that if Patel legitimately owned the stocks he sold, then there would be no need for him to kickback over 50% of the proceeds he received from the sales of those stocks to other Defendants. (Doc. No. 6-1 at 24.) As such, the SEC has demonstrated a prima facie case against Defendant Patel for aiding and abetting securities fraud.

> B.  Whether the SEC Has Demonstrated a Reasonable Likelihood That the Violations Will Be Repeated

"Once the SEC has established a prima facie case of the alleged Securities Act and Exchange Act violations, whether a preliminary injunction should issue turns on the likelihood that defendants will commit future violations." Muehler, 2018 WL 1665637, at *8. "The likelihood of future violations depends on the totality of the circumstances, and the existence of past violations may give rise to an inference that there will be violations in the future." Id. (citing SEC v. Murphy, 626 F.2d 633, 655 (9th Cir. 1980)). In predicting likelihood, a court may consider the degree of scienter and the recurrent nature of the conduct. Id.

The evidence in the record shows that Defendants Sripetch, Flores, Knight, and Patel engaged in or aided and abetted stock scalping schemes that spanned from at least 2013 to 2019 and involved the common stock of at least 20 different companies. (See Doc. No. 6-3, Tong Decl. ¶ 9, Ex. N.) In light of the recurrent nature of these schemes over a long period of time, the SEC has demonstrated a high likelihood of future violations.

### C. Winter Factors

Although the Court has evaluated the present motion for a preliminary injunction under the above two-part test, the Court notes that even if it were to employ the standard four-factor test for injunctive relief set forth in Winter, the SEC has demonstrated that it is entitled to a preliminary injunction. As shown above, the SEC has demonstrated a likelihood of success as to its various claims against Defendants Sripetch, Flores, Knight, and Patel for violations of securities laws. See supra. Further, because the SEC has demonstrated a likelihood of success on its claims for violations of securities laws, the SEC has also demonstrated a likelihood of irreparable injury. See United States v. Nutri-cology, Inc., 982 F.2d 394, 398 (9th Cir. 1992) ("In statutory enforcement cases where the government has met the 'probability of success' prong of the preliminary injunction test, we presume it has met the 'possibility of irreparable injury' prong because the passage of the statute is itself an implied finding by Congress that violations will harm the public."). In addition, the balance of equities favors the SEC as Defendants' stock scalping scheme is prohibited and serves no legitimate purpose. Finally, an injunction prohibiting Defendants Sripetch, Flores, Knight, and Patel from committing future violations of securities laws is in the public interest. See SEC v. Mizrahi, No. CV 19-2284 PA (JEMX), 2019 WL 3241185, at *4 (C.D. Cal. Apr. 10, 2019) ("The SEC is authorized by Congress to enforce securities laws and to safeguard the public. Thus, the SEC's requested preliminary injunction enjoining Defendants from committing future violations of securities laws is in the interest of the public.").

///

///

D.   <u>Asset Freeze</u>

"'[F]ederal courts have inherent equitable authority to issue a variety of "ancillary relief" measures in actions brought by the SEC to enforce the federal securities laws.'" <u>SEC v. Hickey</u>, 322 F.3d 1123, 1131 (9th Cir. 2003); <u>see also</u> <u>In re San Vicente Med. Partners Ltd.</u>, 962 F.2d 1402, 1406 (9th Cir. 1992) ("Generally, federal courts enjoy wide discretion in fashioning relief and protective measures in SEC actions."). This includes the authority to issue an asset freeze. <u>See, e.g.</u>, <u>Hickey</u>, 322 F.3d at 1131.

"The purpose of an asset freeze is to prevent the dissipation and waste of assets so that they will be available for disgorgement." <u>SEC v. Janus Spectrum LLC</u>, No. CV-15-609-PHX-SMM, 2016 WL 614002, at *4 (D. Ariz. Feb. 16, 2016) (citing <u>Hickey</u>, 322 F.3d at 1132); <u>see</u> <u>SEC v. Infinity Grp. Co.</u>, 212 F.3d 180, 197 (3d Cir. 2000) (internal citations omitted) ("A freeze of assets is designed to preserve the status quo by preventing the dissipation and diversion of assets."). "A party seeking an asset freeze must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted." <u>Johnson v. Couturier</u>, 572 F.3d 1067, 1085 (9th Cir. 2009); <u>accord</u> <u>Schooler</u>, 902 F. Supp. 2d at 1359. The determination of whether to issue an asset freeze is committed the district court's discretion. <u>See</u> <u>Hickey</u>, 322 F.3d at 1128 (reviewing the issuance of an asset freeze for abuse of discretion); <u>Reebok Int'l, Ltd. v. Marnatech Enterprises, Inc.</u>, 970 F.2d 552, 563 (9th Cir. 1992) (same).

The SEC has shown a likelihood of dissipation absent an asset freeze as to Defendants Sripetch and Patel. The SEC has presented evidence showing that the bank accounts of King Mutual, which is controlled by Sripetch, have been closed or largely emptied. (<u>See</u> Doc. No. 6-3, Tong Decl. ¶¶ 5, 7, 30.) This supports the issuance of an asset freeze. <u>See</u> <u>SEC v. Credit First Fund, LP</u>, No. CV 05-8741DSFPJWX, 2006 WL 4729240, at *15 (C.D. Cal. Feb. 13, 2006). In addition, Sripetch is a Thai citizen, and Patel is a Canadian citizen. (Doc. No. 6-3, Tong Decl. ¶¶ 5, 8.) This raises concerns that they have little incentive to keep any assets within the jurisdiction of this Court. These facts also support the issuance of an asset freeze. <u>See, e.g.</u>, <u>SEC v. Gonzalez de Castilla</u>, 145 F.

15

20-cv-01864-H-AGS

Supp. 2d 402, 420 (S.D.N.Y. 2001) ("[B]ecause each of these defendants is a citizen and resident of Mexico with Mexican and other off-shore bank accounts (and therefore the capacity to transfer the funds beyond the jurisdiction of this Court), the SEC has met its burden to justify extending the asset freeze until the trial or resolution of this matter."); SEC v. Dubovoy, No. CV 15-6076, 2015 WL 6122261, at *9 (D.N.J. Oct. 16, 2015) ("[T]he fact that Mr. Amaryan, who controls the foreign entities, lives abroad raises a serious concern that he may transfer corporate funds beyond the Court's jurisdiction and dissipate the assets available for any eventual award."). In sum, the SEC has demonstrated the need for an asset freeze as to Defendants Sripetch and Patel. As a result, the Court grants the SEC's request for an asset freeze against Defendants Sripetch and Patel in the amounts requested.

In their motion to modify the preliminary injunction, Defendants Sripetch and Flores request a modification of the SEC's proposed asset freeze as to Sripetch to allow Sripetch access to certain funds and assets otherwise subject to the asset freeze in order to pay for reasonable living expenses. (Doc. No. 19 at 1.) Subsequently, the SEC filed a response stating that the parties have reached an agreement as to the asset freeze issue; and the SEC and Defendant Sripetch submitted a joint proposed order to modify the preliminary injunction. (Doc. Nos. 26, 26-1). As such, the Court grants the parties' joint request to modify the preliminary injunction, and the Court will issue the joint proposed modification order. Cf. SEC v. Bivona, No. 16-CV-01386-EMC, 2016 WL 2996903, at *3 (N.D. Cal. May 25, 2016) (citing FTC v. Trek All., Inc., 81 F. App'x 118, 119 (9th Cir. 2003)) (explaining that whether to modify an asset freeze is a matter for the Court's discretion); SEC v. Private Equity Mgmt. Grp., Inc., No. CV 09-2901 PSG (EX), 2009 WL 2058247, at *3 (C.D. Cal. July 9, 2009) ("Courts regularly hold that they have discretion to modify the asset freeze to release funds to pay living expenses.").

E. <u>Other Relief</u>

In its motion, the SEC also requests an order for Defendants Sripetch, Knight, and Patel to provide a verified written accounting and an order prohibiting Defendants Sripetch,

Flores, Knight, and Patel from destroying documents. (Doc. No. 6-1 at 1, 27.) The SEC explains that an accounting is critical to identifying assets for disgorgement and civil penalties, as well as determining which defendant obtained particular monies from each of the 20 instances of scalping identified in their motion. (Id. at 27.)

"'[F]ederal courts have inherent equitable authority to issue a variety of "ancillary relief" measures in actions brought by the SEC to enforce the federal securities laws.'" Hickey, 322 F.3d at 1131; see also San Vicente Med. Partners Ltd., 962 F.2d at 1406 ("Generally, federal courts enjoy wide discretion in fashioning relief and protective measures in SEC actions."). Based on the evidence and arguments presented by the SEC, the Court concludes that the requested relief is appropriate. As such, the Court grants the SEC's request for an accounting as to Defendants Sripetch, Knight, and Patel and an order prohibiting the destruction of documents as to Defendants Sripetch, Flores, Knight, and Patel. See, e.g., Credit First Fund, 2006 WL 4729240, at *15 (ordering an accounting and prohibiting the destruction of any related documents).

## CONCLUSION

In sum, Plaintiff SEC has demonstrated that it is entitled to the requested preliminary injunctive relief. As such, the Court grants Plaintiff SEC's motion for a preliminary injunction, and the Court grants Plaintiff SEC and Defendant Sripetch's joint request for entry of an order modifying the preliminary injunction. The Court will issue the preliminary injunction and the requested modification order in separate and concurrently filed orders.

**IT IS SO ORDERED.**

DATED: November 2, 2020

_____
MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT