**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                              Plaintiff,<br><br>v.<br><br>ONGKARUCK SRIPETCH; AMANDA FLORES; BREHNEN KNIGHT; ANDREW MCALPINE, ASHMIT PATEL; MICHAEL WEXLER; DOMINIC WILLIAMS; ADTRON INC. a/k/a STOCKPALOOZA.COM; ATG INC.; DOIT, LTD.; DOJI CAPITAL, INC.; KING MUTUAL SOLUTIONS INC.; OPTIMUS PRIME FINANCIAL INC.; ORCA BRIDGE; REDLINE INTERNATIONAL; and UAIM CORPORATION,<br><br>                              Defendants. | Case No.: 20-cv-01864-H-BGS<br><br>**ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR REMEDIES AS TO DEFENDANT SRIPETCH**<br><br>[Doc. No. 118.] |

On December 22, 2023, Plaintiff Securities and Exchange Commission ("SEC") filed a motion for remedies against Defendant Ongkaruck Sripetch. (Doc. No. 118.) On February 29, 2024, Defendant Sripetch filed a response in opposition to the SEC's motion for remedies. (Doc. No. 142.) On March 7, 2024, the SEC filed a reply. (Doc. No. 145.)

The Court held a hearing on Plaintiff SEC's motion on March 25, 2024. Christopher J. Dunnigan and Kristine M. Zaleskas appeared for Plaintiff SEC. Tyler R. Creekmore and Greg T. Nolan appeared for Defendant Sripetch. On April 8, 2024, Defendant Sripetch filed a supplemental declaration in response to the Court's March 25, 2024 scheduling order. (Doc. No. 163, Creekmore Decl.; see Doc. No. 159.) For the reasons below, the Court grants in part Plaintiff SEC's motion for remedies.

## Background

### I. Procedural History

On September 21, 2020, Plaintiff SEC filed a complaint against Defendants Sripetch, Amanda Flores, Brehnen Knight, Andrew McAlpine, Ashmit Patel, Michael Wexler, and Dominic Williams ("the Individual Defendants") and against Defendants Adtron Inc. aka Stockpalooza.com, ATG Inc., DOIT Ltd., Doji Capital, Inc., King Mutual Solutions Inc., Optimus Prime Financial Inc. ("Optimus"), Orca Bridge, Redline International, and UAIM Corporation ("the Entity Defendants"), alleging various claims for: violations of Sections 9(a) and 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. §§ 78i(a) and 78j(b); violations of Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("the Securities Act"), 15 U.S.C. §§ 77e(a), 77e(c), 77q(a); violations of Rule 10b-5, 17 C.F.R. § 240.10b-5; and aiding and abetting violations of those provisions. (Doc. No. 1, Compl.)

On September 22, 2020, Plaintiff SEC filed an ex parte motion for a temporary restraining order against Defendants Sripetch, Knight, Patel, and Flores. (Doc. No. 6.) On September 22, 2020, the Court granted Plaintiff's motion and entered the requested TRO. (Doc. No. 12.) On October 5, 2020, the Court held an order to show cause hearing. At the hearing, the Court temporarily granted Plaintiff's motion for a preliminary injunction, and the Court converted the September 22, 2020 TRO into a preliminary injunction. (Doc. No. 17.)

On January 19, 2021, the Court granted the United States of America's motion to intervene in the action for the limited purposes of moving for a stay, and the Court granted

the United States's motion to stay the action pending the related criminal case <u>United States v. Sripetch</u>, 20-cr-160-H.  (Doc. No. 54 at 8.)  On December 19, 2023, the parties filed a joint status report.  (Doc. No. 67.)  On May 15, 2023, the parties filed a second joint status report.  (Doc. No. 72.)  On May 23, 2023, the Court lifted the stay, and the Court issued a scheduling order.  (Doc. No. 73.)

On August 9, 2023, the Court entered a bifurcated consent judgment as to Defendant Flores.  (Doc. No. 84.)  On August 14, 2023, Plaintiff SEC filed an amended complaint.  (Doc. No. 87.)  On September 11, 2023, the Court entered a bifurcated consent judgment as to Defendant Sripetch.  (Doc. No. 92.)  The Court's bifurcated judgment as to Defendant Sripetch left the issues of civil penalties, disgorgement, and prejudgment interest to be decided by the Court at a later stage of the proceedings.  (<u>Id.</u> at 5 § VI.)

On October 5, 2023, Plaintiff SEC voluntarily dismissed entity Defendants DOIT Ltd., Doji Capital, Inc., King Mutual Solutions Inc., Optimus Prime Financial Inc., Orca Bridge, Redline International, and UAIM Corporation.  (Doc. Nos. 94-100.)  On December 5, 2023, Defendant Wexler filed an answer to Plaintiff's amended complaint.  (Doc. No. 109.)

On January 8, 2024, the Court entered a final judgment as to Defendant Flores.  (Doc. No. 124.)  On January 31, 2024, the Court entered a final default judgment against Defendant Williams.  (Doc. No. 129.)  On February 16, 2024, Defendant McAlpine filed an answer to Plaintiff's amended complaint.  (Doc. No. 137.)

By the present motion, Plaintiff SEC moves for disgorgement in the amount of $4,115,365.88 against Defendant Sripetch and prejudgment interest thereon of $1,708,437.26.[1]  (Doc. No. 118-1 at 1.)  In the motion, Plaintiff SEC further states: "In

---

[1] After Defendant Sripetch initially failed to file an opposition to Plaintiff SEC's motion for remedies, on February 6, 2024, the Court granted Plaintiff SEC's motion for disgorgement.  (Doc. No. 132.)  On February 14, 2024, after a showing of excusable neglect under Federal Rule of Civil Procedure 60(b) by Defendant Sriptech, the Court vacated its February 6, 2024 order granting Plaintiff SEC's motion for remedies.  (Doc. No. 136.)

3

light of the prison sentence imposed in the parallel criminal matter . . . , the Commission does not request civil penalties."[2]  (Id.)

## II.     Relevant Facts

Pursuant to the Court's September 11, 2023 consent judgment entered against Defendant Sripetch, for the purposes of a motion for disgorgement and/or civil penalties by the SEC, Defendant Sripetch has conceded that the factual allegations in Plaintiff SEC's amended complaint are accepted and deemed as true by the Court.  (Doc. No. 92 at 5 § VI.)  Those factual allegations are as follows:

### A.     The Fraudulent Stock Scalping Schemes

From at least August 2013 to at least December 2017, Defendant Sripetch along with the other Defendants in this action worked in concert to engage in numerous fraudulent schemes and other violations of federal securities laws, involving at least 20 penny stock companies.  (Doc. No. 87, FAC ¶¶ 1, 31.)  These schemes followed the same general pattern:

- First, a subset of the Defendants [including Defendant Sripetch] obtained shares of a microcap issuer through convertible debt agreements, usually claiming to purchase convertible debt through a series of transactions involving intermediaries, and then converting the debt to stock. . . .
- Next, some of the Defendants would promote the issuer.  In some instances, they promoted the issuer through Sripetch's own website Stockpalooza.com.  However, for most the issuers, a Defendant or Defendants paid an intermediary entity (the "Conduit"), which then wired the funds to third-party promoters (minus a portion purportedly for a commission).
- The promotions did not identify any of the Defendants as the ultimate funder of the promotion, and did not disclose that the actual funder of the promotions was planning to sell stock in the issuers being promoted.  Many of the promotions were silent of the funder's intentions.  Others

---

[2]     Defendant Sripetch received a custodial sentence of 21 month in the related criminal proceeding, United States v. Sripetch, 20-cr-160-H-1, Docket No. 128 (S.D. Cal., Aug. 1, 2022).

- misleadingly indicated that there was a mere possibility the funder would sell.
- Following the promotions, liquidity of the issuer's stock increased and the share price rose, and the Defendants who held stock in that issuer promptly sold.

(Id. ¶ 32.)

This practice of promoting a stock without disclosing a present or immediate intent to sell the stock is called "scalping," and it violates the antifraud provisions of the securities law. (Id. ¶ 33.) Between August 2013 and February 2019, Defendant Sripetch, directly and indirectly, through entities he controlled, participated in the scalping of shares of stock in 20 different issuers. (Id. ¶ 38.) Through these various scalping schemes, Sripetch and certain other defendants obtained illicit sales proceeds of over $6.6 million. (Id. ¶ 37.)

B.   The Sale of Unregistered Abby Securities

Since at least 2013, Defendant Sripetch along with Defendant Flores controlled Abby Inc. (Doc. No. 87, FAC ¶ 100.) On or around June 5, 2013, Abby issued over 15 million restricted shares to three entities controlled by Sripetch and Flores. (Id. ¶ 102.) The entities then, without waiting the required holding period, sold the shares. (Id. ¶ 103.) There was no registration statement in effect for any of these sales of Abby stock. (Id. ¶ 104.)

From November 2013 through November 2016, Defendants Sripetch and Flores were responsible for the issuance of another 25 million shares of Abby stock, which were then sent to entities controlled by Sripetch and Flores. (Id. ¶ 108.) Like before, the entities almost immediately began selling the shares to the public, and no registration statement was in effect for any of the issuances. (Id. ¶ 109.)

C.   The Cross-Trading Scheme in VMS Rehab Systems Stock

Between March 2016 and June 2016, Defendant Sripetch and Defendant Knight engaged in a series of matched order and wash trades that were intended to (an in fact, did) lift the price of stock in VMS Rehab Systems. (Doc. No. 87, FAC ¶ 115.) These orders were made within minutes, and at times seconds, of each other. (Id.) Sripetch and Knight

did this on 16 different days, and on 13 of these days, their trades constituted 50% or more of the total market trading for VMS stock. (Id. ¶ 116.) On four of these days, the trading activity by Sripetch and Knight constituted 100% of the daily market trading for VMS stock. (Id.) Sripetch and Knight engaged in this coordinated trading activity in advance of a series of stock promotions funded by Sripetch's network. (Id.)

### D. The Argus Worldwide Stock Pump and Dump Schemes

In 2018 through early 2019, Defendant Sripetch along with Defendants Knight, Wexler, and McAlpine engaged in a series of manipulations of Argus Worldwide stock with the intention of profiting from "pumping and dumping" the stock. (Doc. No. 87, FAC ¶ 117.) The scheme began in April 2018, when Sripetch engaged in a series of matched trades in Argus Worldwide stock, using accounts controlled by his network. (Id. ¶ 118.) These trades were designed to create the appearance of active market interest in Argus Worldwide stock, upward momentum in the stock price, and on many occasions, to set the closing price of the stock. (Id.) This pattern of pre-promotion trading activity, often referred to as "building the chart," is a typical step undertaken by fraudulent actors prior to a pump and dump scheme. (Id.)

Following those matched trades, an intermediary conduit entity ran a promotional campaign touting Argus Worldwide stock. (Id. ¶ 119.) The promotions were designed to generate investor demand in the stock, so that Sripetch and the other defendants involved could dump the stock on the market at a substantial profit. (Id.) The promotions did not disclose that Sripetch and his associates intended to sell their Argus Worldwide stock. (Id.) In connection with this scheme, Defendant Knight transferred proceeds of sales of Argus Worldwide stock to Sripetch. (Id. ¶ 121.)

In late December 2018, Sripetch along with Defendants Knight and Wexler decided to engage in another pump and dump of Argus Worldwide stock. (Id. ¶ 126.) As part of this scheme, Sripetch and McAlpine engaged in a series of cross-trades, and Sripetch then arranged for a promotional email campaign. (Id. ¶¶ 127, 129.) None of the promotional emails disclosed that Sripetch and his network also owned shares of Argus Worldwide

stock and that they planned to sell them. (Id. ¶ 129.) Following the commencement of Sripetch's promotional email campaign, on February 4, 2019, Sripetch and McAlpine began dumping their Argus Worldwide stock for $214,519 in combined proceeds. (Id. ¶ 130.) The SEC suspended trading in Argus Worldwide the following day. (Id. ¶ 131.)

## Discussion

### I. Disgorgement

#### i. Legal Standards

Under 15 U.S.C. § 78u(d)(5), "federal courts may grant 'any equitable relief that may be appropriate or necessary for the benefit of investors,' including disgorgement of the gains obtained from securities law violations." S.E.C. v. World Cap. Mkt., Inc., 864 F.3d 996, 1003 (9th Cir. 2017) (quoting 15 U.S.C. § 78u(d)(5)); see Liu v. S.E.C., 140 S. Ct. 1936, 1940 (2020) (holding that district courts have power to issue a disgorgement award under 15 U.S.C. § 78u(d)(5)). A district court may only order disgorgement pursuant to § 78u(d)(5) in an amount that "does not exceed a wrongdoer's net profits and is awarded for victims." Liu, 140 S. Ct. at 1940; see S.E.C. v. Berkeley Healthcare Dynamics, LLC, No. 20-16754, 2022 WL 42807, at *1 (9th Cir. Jan. 5, 2022); S.E.C. v. Yang, 824 F. App'x 445, 447 (9th Cir. 2020).

In addition, under 15 U.S.C. §§ 78u(d)(3) and (d)(7), a district court "may order . . . disgorgement" "of any unjust enrichment by the person who received such unjust enrichment as a result" of violating securities laws. "'Disgorgement is designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable.'" S.E.C. v. Platforms Wireless Int'l Corp., 617 F.3d 1072, 1096 (9th Cir. 2010).

"Disgorgement need be 'only a reasonable approximation of profits causally connected to the violation.'" Id. (quoting S.E.C. v. First Pac. Bancorp, 142 F.3d 1186, 1192 n.6 (9th Cir. 1998)). The SEC "bears the ultimate burden of persuasion that its disgorgement figure reasonably approximates the amount of unjust enrichment." Id. (quoting S.E.C. v. First City Fin. Corp., 890 F.2d 1215, 1232 (D.C. Cir. 1989)). "Once the

SEC establishes a reasonable approximation of defendants' actual profits, however, . . . the burden shifts to the defendants to 'demonstrate that the disgorgement figure was not a reasonable approximation.'" Id.

   ii. <u>Whether the SEC Must Identify Harmed Investors and Explain How the Requested Disgorged Fund Would Benefit Those Investors</u>

  As an initial matter, Defendant Sripetch argues that the SEC's motion should be denied because the SEC has failed to provide the Court with any evidence identifying harmed investors or explaining how the requested disgorged funds would benefit those investors as required by the Supreme Court's decision in <u>Liu v. S.E.C.</u>, 140 S. Ct. 1936 (2020). (Doc. No. 142-1 at 1, 2-10.) In response, Plaintiff SEC argues that the Court should reject Defendant's argument because binding Ninth Circuit law holds that disgorgement is not to compensate victims and nothing in <u>Liu</u> conflicts with that holding. (Doc. No. 145 at 2.)

  In <u>Liu</u>, the Supreme Court held that "a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under § 78u(d)(5)." 140 S. Ct. at 1940. In reaching this holding, the Supreme Court explained that the relevant statute, 15 U.S.C. § 78u(d)(5), provides for "equitable relief." <u>Id.</u> at 1942. The Supreme Court then noted that equity jurisdiction reveals "two principles:"

> First, equity practice long authorized courts to strip wrongdoers of their ill-gotten gains . . . . Second, to avoid transforming an equitable remedy into a punitive sanction, courts restricted the remedy to an individual wrongdoer's net profits to be awarded for victims.

<u>Id.</u>

  Defendant Sripetch argues that, under <u>Liu</u>'s holding, the SEC is required to prove that investors were harmed and that the disgorged funds will go to those harmed investors. (Doc. No. 142-1 at 9.) The Court notes that the Supreme Court's holding in <u>Liu</u> specifically applies to disgorgement awards made pursuant to 15 U.S.C. § 78u(d)(5). <u>See Liu</u>, 140 S. Ct. at 1940. Here, Plaintiff SEC seeks a disgorgement award under sections 78u(d)(3) and (d)(7) in addition to section 78u(d)(5). (<u>See</u> Doc. No. 118-1 at 8.)

As Defendant Sriptech acknowledges, there is a split of out-of-circuit authority regarding whether Liu's holding applies to disgorgement awards under 15 U.S.C. §§ 78u(d)(3) and (d)(7). (See Doc. No. 142-1 at 4-5.) In S.E.C. v. Hallam, the Fifth Circuit held that the Supreme Court's holding in Liu does not apply to disgorgement awards under 15 U.S.C. §§ 78u(d)(3) and (d)(7). See 42 F.4th 316, 338 (5th Cir. 2022) ("As amended, Section 78u(d) authorizes disgorgement in a legal—not equitable—sense. In doing so, it ratifies the pre-Liu disgorgement framework used by every circuit court of appeals."), 341 ("Sections 78u(d)(3) and (d)(7) authorize legal 'disgorgement' apart from the equitable 'disgorgement' permitted by Liu."). In S.E.C. v. Govil, the Second Circuit expressly disagreed with the Fifth Circuit's holding in Hallam and instead held that "'disgorgement under § 78u(d)(7) must comport with traditional equitable limitations as recognized in Liu.'" See S.E.C. v. Govil, 86 F.4th 89, 100–04 (2d Cir. 2023) (quoting S.E.C. v. Ahmed, 72 F.4th 379, 396 (2d Cir. 2023)) ("[D]isgorgement under both § 78u(d)(5) and § 78u(d)(7) are constrained by Liu.").[3]

Nevertheless, the Court need not resolve this split of out-of-circuit authority because, in light of the allegations in Plaintiff SEC's first amended complaint, which the Court must accept as true pursuant to the parties' consent judgment, Plaintiff SEC has demonstrated that investors have been harmed by Defendant Sripetch's fraudulent schemes. (See Doc. No. 145 at 5-6; Doc. No. 87, FAC ¶¶ 1, 32-33, 36-38, 42, 59, 68, 98, 117-30.) See S.E.C. v. iFresh, Inc., No. 22CV3200ARRSJB, 2024 WL 416709, at *3 (E.D.N.Y. Feb. 5, 2024)

---

[3]   Plaintiff SEC contends that "[b]inding Ninth Circuit precedent holds that, '[u]nlike … damages,' disgorgement is ordered to 'prevent unjust enrichment and to make securities law violations unprofitable, not to compensate victims.'" (Doc. No. 145 at 2 (quoting Platforms Wireless, 617 F.3d at 1097).) The Court does not find the SEC's reliance on this specific holding from Platforms Wireless persuasive. Platforms Wireless is a pre-Liu and pre-Section 78u(d)(7) decision regarding a district court's ability to order disgorgement under its "'broad equity powers.'" See Platforms Wireless, 617 F.3d at 1096–97. As such, the Supreme Court's holding in Liu that a disgorgement award under § 78u(d)(5) must not exceed a wrongdoer's net profits and be awarded for victims overrules that specific holding from Platforms Wireless. See Liu, 140 S. Ct. at 1940.

("The SEC's allegation that iFresh's stock prices were artificially inflated during the relevant time period, taken as true, also establishes the requisite pecuniary harm to those who purchased iFresh stock during that time period." (citing Govil, 86 F.4th at 104)). In addition, at the hearing, Plaintiff SEC represented to the Court that it will make good faith efforts to ensure that any disgorgement award will go to those harmed investors. (See Doc. No. 145 at 1.) Indeed, the SEC represented that it has already conducted a preliminary assessment for a distribution to defrauded investors. (See id.) As such, the Court rejects Defendant Sripetch's argument that the Court should deny the SEC's motion for disgorgement in light of Lui's holding.

### iii. The Proper Disgorgement Amount

In its motion, Plaintiff SEC requests that the Court order Defendant Sripetch to pay $4,115,365.88 in disgorgement. (Doc. No. 118-1 at 7.) In response, Defendant Sripetch contests that the amount and asserts that he should instead be ordered to pay no more $1,942,418.48 in disgorgement. (Doc. No. 142-1 at 10-11.)

"Disgorgement need be 'only a reasonable approximation of profits causally connected to the violation.'" Platforms Wireless, 617 F.3d at 1096. The SEC "bears the ultimate burden of persuasion that its disgorgement figure reasonably approximates the amount of unjust enrichment." Id. "Once the SEC establishes a reasonable approximation of defendants' actual profits, however, . . . the burden shifts to the defendants to 'demonstrate that the disgorgement figure was not a reasonable approximation.'" Id.

The Ninth Circuit has explained that this burden shifting approach is appropriate because "information is not 'obtainable at negligible cost.'" Id. "The defendants are more likely than the SEC to have access to evidence establishing what they paid for the securities, if anything, to whom the proceeds from the sales were distributed, and for what purposes the proceeds were used." Id. Further, "'the risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty.'" Id.

On September 11, 2023, the Court entered a consent judgment against Defendant Sripetch. (Doc. No. 92.) Under the terms of that consent judgment, for the purposes of a

motion for disgorgement by the SEC, Defendant Sripetch conceded that the factual allegations in Plaintiff SEC's amended complaint are accepted and deemed as true by the Court. (Id. at 5 § VI.) In addition, the parties agreed that the Court may determine the issues raised in a motion for disgorgement based on declarations without regard to the standards for summary judgment contained in Federal Rule of Civil Procedure 56(c). (Id.)

In support of its request for disgorgement, Plaintiff SEC has provided the Court with a declaration from one of its fraud analysts stating that after analyzing relevant bank accounts, brokerage accounts, and transfer agents, he determined that: (1) Sripetch received $2,042,284.12 in net profits from selling shares of microcap stock into the various promotional campaigns detailed in this order and in Plaintiff SEC's amended complaint (Doc. No. 118-2, Tong Decl. ¶ 4(a); see Doc. No. 87, FAC ¶¶ 31-99); (2) Sripetch received $25,830.16 in proceeds from the unregistered sales of Abby stock (Doc. No. 118-2, Tong Decl. ¶ 4(b); see Doc. No. 87, FAC ¶¶ 100-12); and (3) Sripetch received $2,047,251.60 in pass-through profits and kickbacks from other individuals involved in the various fraudulent schemes. (Doc. No. 118-2, Tong Decl. ¶ 4(c); see Doc. No. 87, FAC ¶¶ 74, 78, 82, 84, 88, 92, 96, 97.) Accepting the allegations in Plaintiff SEC's amended complaint as true along with the information contained in the SEC's declaration, Plaintiff SEC has demonstrated that its disgorgement figure of $4,115,365.88 reasonably approximates the amount of unjust enrichment here. As such, the burden now shifts to Defendant Sripetch to demonstrate that the SEC's disgorgement figure is not a reasonable approximation. See Platforms Wireless, 617 F.3d at 1096.

In an effort to meet his burden, Defendant Sripetch has provided the Court with a declaration stating that according to his tax returns, between 2013 and 2019, he reported a gross profit of $3,275,200.08 and also that during that time he incurred a total of $1,023,276.92 in expenses. (Doc. No. 142-2, Sripetch Decl. ¶¶ 4-5.) In response, the SEC contends that Defendant Sripetch's declaration is insufficient. (Doc. No. 145 at 6-8.) Plaintiff SEC notes that Defendant Sripetch has not provided the Court with his actual tax returns and has not provided the Court with any documentation to substantiate his expenses

calculation. (Id.) The Court rejects these challenges to the Sripetch declaration and finds the information in the declaration to be sufficiently supported. As such, the Court accepts Defendant Sripetch's calculations of his gross profit as $3,275,200.08 and his business expenses as $1,023,276.92.

But the Court rejects Defendant Sripetch's attempt to further reduce the disgorgement amount by $309,504.68 by factoring in the cost basis for the relevant stocks. (See Doc. No. 142-2, Sripetch Decl. ¶ 6; Doc. No. 142-1 at 11-12.) Plaintiff SEC correctly notes that Defendant Sripetch's gross profit calculation should already reflect the deduction of any cost basis for the stocks. (Doc. No. 145 at 7 (citing S.E.C. v. Retail Pro, Inc., 673 F. Supp. 2d 1108, 1119 (S.D. Cal. 2009) (explaining that "gross profit" is "revenues minus cost of goods sold")). Further, in his supplemental declaration, Plaintiff's counsel concedes that it is more likely than not that Defendant Sriptech's cost basis was included in his 2013 to 2019 tax returns; and, "[t]herefore, the cost basis number should be added to Mr. Sripetch's disgorgement calculation." (Doc. No. 163, Creekmore Decl. ¶¶ 3-5.)

In sum, in light of the evidence presented by Defendant Sripetch, the Court concludes that the proper disgorgement amount is $2,251,923.16. As such, the Court imposes $2,251,923.16 in disgorgement against Defendant Sripetch. See also, e.g., S.E.C. v. JT Wallenbrock & Assocs., 440 F.3d 1109, 1112 (9th Cir. 2006) (affirming a disgorgement order entered after the district court entered a consent judgment against the defendants precluding the defendants from arguing that they did not violate the federal securities laws in the manner set out in the complaint).

## II.   Prejudgment Interest

Plaintiff SEC also moves for prejudgment interest. (Doc. No. 118-1 at 10.) "Awards of disgorgement typically 'include prejudgment interest to ensure that the wrongdoer does not profit from the illegal activity.'" S.E.C. v. Harrison, No. 221CV01610SPGDFM, 2023 WL 4681542, at *2 (C.D. Cal. Jan. 18, 2023) (quoting S.E.C. v. Cross Fin. Servs., Inc., 908 F. Supp. 718, 734 (C.D. Cal. 1995)); see S.E.C. v. Crowd Mach., Inc., No. 4:22-CV-0076-HSG, 2023 WL 8438553, at *3 (N.D. Cal. Dec. 5, 2023).

Defendant Sripetch's bifurcated consent judgment provides that prejudgment interest will be "calculated from August 15, 2013, based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. § 6621(a)(2)." (Doc. No. 92 at 5 § VI.)  As such, the Court will impose prejudgment interest against Defendant Sripetch based on the IRS underpayment rate.  See, e.g., S.E.C. v. Ahmed, 72 F.4th 379, 403 (2d Cir. 2023) (affirming award of prejudgment interest at the IRS underpayment rate); S.E.C. v. Bartlett, No. SACV2300765CJCJDEX, 2023 WL 8605276, at *7 (C.D. Cal. Sept. 12, 2023) (awarding prejudgment interest at the IRS underpayment rate).

## Conclusion

For the reasons above, the Court grants in part Plaintiff SEC's motion for remedies against Defendant Sripetch.  The Court imposes $2,251,923.16 in disgorgement along with prejudgment interest on that amount based on the IRS underpayment rate against Defendant Sripetch.  The parties must both: (1) file a calculation of the appropriate amount of prejudgment interest on the Court's $2,251,923.16 disgorgement order; and (2) submit a proposed final judgment as to Defendant Sripetch to the Court **within (7) seven days from the date this order is filed**.

**IT IS SO ORDERED.**

DATED: April 8, 2024

_____
MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT