1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

SECURITIES AND EXCHANGE
COMMISSION,

                                    Plaintiff,

v.

ONGKARUCK SRIPETCH; AMANDA
FLORES; BREHNEN KNIGHT;
ANDREW MCALPINE, ASHMIT
PATEL; MICHAEL WEXLER;
DOMINIC WILLIAMS; ADTRON INC.
a/k/a STOCKPALOOZA.COM; ATG
INC.; DOIT, LTD.; DOJI CAPITAL,
INC.; KING MUTUAL SOLUTIONS
INC.; OPTIMUS PRIME FINANCIAL
INC.; ORCA BRIDGE; REDLINE
INTERNATIONAL; and UAIM
CORPORATION,

                                    Defendants.

Case No.:  20-cv-01864-H-BJC

**ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT WEXLER**

[Doc. No. 218.]

On November 6, 2024, Plaintiff Securities and Exchange Commission ("SEC") filed a motion for summary judgment as to liability against Defendant Michael Wexler. (Doc. No. 218.)   On November 25, 2024, Defendant Wexler filed a response in

opposition to the SEC's motion for summary judgment.  (Doc. No. 239.)  On December 6, 2024, the SEC filed a reply.  (Doc. No. 243.)

The Court held a hearing on Plaintiff SEC's motion for summary judgment on December 16, 2024.  Christopher J. Dunnigan and Kristine M. Zaleskas appeared for Plaintiff SEC.  Tamara L. Rozmus appeared for Defendant Wexler.  For the reasons below, the Court grants Plaintiff SEC's motion for partial summary judgment.

## Background

### I.    Factual Background

The following factual background is taken from the undisputed facts in the record. During the relevant period, Defendant Wexler was the CEO of Argus Worldwide Corp ("Argus").  (Doc. No. 219, Knight Decl. ¶ 3; Doc. No. 224, Dunnigan Decl. ¶¶ 3-4, Exs. A, B.)  Argus is a publicly traded company that trades on OTC Link with the ticker symbol "ARGW."  (Doc. No. 224, Dunnigan Decl. ¶ 2.)

In 2017, Defendant Wexler reached out to Defendants Ongkaruck Sripetch and Brehnen Knight, and the three of them agreed to execute a pump-and-dump scheme with Argus stock.  (Doc. No. 219, Knight Decl. ¶ 3; see also Doc. No. 224-21, Dunnigan Decl. Ex. V at 15-16.)  "'Pump and dump' schemes 'involve the touting of a company's stock (typically microcap companies) through false and misleading statements to the marketplace.  After pumping the stock, fraudsters make huge profits by selling their cheap stock into the market.'"  United States v. Zolp, 479 F.3d 715, 717 n.1 (9th Cir. 2007); see also SEC v. Abellan, 674 F. Supp. 2d 1213, 1219 (W.D. Wash. 2009) ("Scalping" is "a known practice whereby the owner of shares of a security recommends that security for investment and then immediately sells it at a profit upon the rise in the market price which follows the recommendation.").  (See also Doc. No. 219, Knight Decl. ¶ 1.)

Specifically, Defendants Sripetch, Knight, and Wexler agreed that: (1) Wexler would transfer Argus stock to Knight purportedly as a "gift;" (2) then they would attempt to raise the price of Argus stock with Sripetch paying for promotional campaigns for

Argus stock and Wexler creating and issuing press release for Argus timed to coincide with Sripetch's promotional campaigns; and (3) once the price of the stock had risen, Knight and Sripetch would sell the stock and all three of them – Sripetch, Knight, and Wexler – would split the profits obtained from those sales. (Doc. No. 219, Knight Decl. ¶¶ 3-7; Doc. No. 220, Knight Supp. Decl. ¶ 3.)

Defendants Sripetch, Knight, and Wexler then engaged a pump-and-dump scheme for Argus stock in the spring of 2018. Via a letter dated March 1, 2018, Defendant Wexler transferred 1,500,000 shares of Argus stock to Defendant Knight. (Id. ¶ 5, Ex. A; Doc. No. 220, Knight Supp. Decl. ¶ 2, Ex. A.) In an email dated March 4, 2018 from Defendant Wexler to Defendant Knight, Wexler referenced the stock transfer and reminded Knight that "one third of the net proceeds from the sale of Argus . . . will be for the Argus . . . company account or in the alternative for an account to be provided to you, if and as necessary." (Doc. No. 224, Dunnigan Decl. ¶ 10, Ex. H.)

Following the stock transfer, Defendants Sripetch and Wexler engaged in various practices to manipulate the price of the Argus stock. During April 2018, Defendant Sripetch engaged in match trading of Argus stock where he both bought and sold Argus stock simultaneously. (Doc. No. 219, Knight Decl. ¶ 10; see also Doc. No. 165 at 6.) From May 2018 through July 2018, Sripetch funded several promotional emails touting Argus stock and encouraging recipients of the email to purchase Argus stock. (Doc. No. 219, Knight Decl. ¶ 11; see Doc. No. 223, Tong Decl. ¶¶ 5-9, Exs. A.1-A.9.) These promotional emails were false or misleading because they did not disclose the funders of the emails' intention to sell the Argus stock. (See id.; see also Doc. No. 165 at 6-7.) Further, although Defendant Sripetch initially funded these promotion emails, the emails were ultimately paid for from the profits of the later sales of Argus stock that were split between Defendants Sripetch, Knight, and Wexler. (Doc. No. 219, Knight Decl. ¶ 11; Doc. No. 220, Knight Supp. Decl. ¶ 3.) From April 2018 to June 2018, Defendant Wexler issued several press releases for Argus. (Doc. No. 219, Knight Decl. ¶ 12; see Doc. No. 224, Dunnigan Decl. ¶ 15, Ex. L.) Defendant Wexler timed the issuance of

20-cv-01864-H-BJC

these press releases to coincide with Defendant Sripetch's promotional emails.  (See Doc. No. 219, Knight Decl. ¶¶ 12-15, Exs. B, C; see Doc. No. 224, Dunnigan Decl. ¶ 16, Ex. M; see also Doc. No. 224-21, Dunnigan Decl. ¶¶ 22, 26, Ex. V at 20-21, 23-24; Doc. No. 219, Knight Decl. ¶¶ 19-21, 23-24.)

To complete the pump-and-dump scheme, from approximately April 2018 to July 2018, Defendant Knight sold 287,070 shares of Argus stock for $751,026.  (Doc. No. 223, Tong Decl. ¶¶ 14-15, Exs. C, F.)  Defendant Knight then transferred to Defendant Wexler – via an entity controlled by Wexler called Derving Investments, Ltd. ("Derving") – $156,877 as his share of the profits from Knight's sales of the Argus stock. (Doc. No. 219, Knight Decl. ¶¶ 6-7, 25-29, Exs. J, K; Doc. No. 220, Knight Supp. Decl. ¶ 3; Doc. No. 221, Melville Decl. ¶ 5, Ex. B; Doc. No. 222, Ruiz Decl. ¶¶ 3-5, Exs. A, B; Doc. No. 223, Tong Decl. ¶¶ 14-15, Exs. C, F; see also Doc. No. 224-21, Dunnigan Decl. Ex. V at 33-34.)

Defendants Sripetch, Knight, and Wexler along with Defendant Andrew McAlpine engaged in an additional pump-and-dump scheme for Argus stock in the fall of 2018. (See Doc. No. 219, Knight Decl. ¶¶ 16-21.)  This scheme concluded in November 2018, when OTC Link flagged Argus as being the subject of a promotional campaign.  (Doc. No. 224, Dunnigan Decl. ¶¶ 20-21.)  As result, Defendant McAlpine was only able to sell 12,500 shares of Argus stock for $9,065.80.  (See id. ¶ 21, Ex. Q; Doc. No. 223, Tong Decl. ¶ 11, Ex. C.)

Defendants Sripetch, Knight, Wexler, and McAlpine engaged in a third pump-and-dump scheme for Argus stock in early 2019.  (See Doc. No. 219, Knight Decl. ¶¶ 22-24.) This final scheme concluded on February 4, 2019, when the SEC publicly announced the temporary suspension of trading in Argus stock in response to certain press releases. (Doc. No. 224, Dunnigan Decl. ¶ 24, Ex. U.)  Prior to the SEC suspending trading, on February 4, 2019, Defendant Sripetch was able to sell 193,950 shares of Argus stock for $119,900.80, and Defendant McAlpine was able to sell 155,000 shares of Argus stock for $94,618.26.  (See Doc. No. 223, Tong Decl. ¶ 11, Ex. C.)  Subsequently, in March 2019,

Adtron Inc., an entity controlled by Sripetch, sent $33,392.25 to Spectrum Global Diversified Corp., an entity purportedly controlled by Wexler.  (Id. ¶¶ 10, 14, Exs. B, F.)

## II. Procedural History

On September 21, 2020, Plaintiff SEC filed a complaint against Defendants Sripetch, Amanda Flores, Knight, McAlpine, Ashmit Patel, Wexler, and Dominic Williams ("the Individual Defendants") and against Defendants Adtron Inc. aka Stockpalooza.com, ATG Inc., DOIT Ltd., Doji Capital, Inc., King Mutual Solutions Inc., Optimus Prime Financial Inc., Orca Bridge, Redline International, and UAIM Corporation ("the Entity Defendants"), alleging various claims for:  violations of Sections 9(a) and 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. §§ 78i(a) and 78j(b); violations of Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("the Securities Act"), 15 U.S.C. §§ 77e(a), 77e(c), 77q(a); violations of Rule 10b-5, 17 C.F.R. § 240.10b-5; and aiding and abetting violations of those provisions.  (Doc. No. 1, Compl.)

On September 22, 2020, Plaintiff SEC filed an ex parte motion for a temporary restraining order against Defendants Sripetch, Knight, Patel, and Flores.  (Doc. No. 6.) On September 22, 2020, the Court granted Plaintiff's motion and entered the requested TRO.  (Doc. No. 12.)  On October 5, 2020, the Court held an order to show cause hearing.   At the hearing, the Court temporarily granted Plaintiff's motion for a preliminary injunction, and the Court converted the September 22, 2020 TRO into a preliminary injunction.  (Doc. No. 17.)

On January 19, 2021, the Court granted the United States of America's motion to intervene in the action for the limited purposes of moving for a stay, and the Court granted the United States's motion to stay the action pending the related criminal case United States v. Sripetch, 20-cr-160-H.  (Doc. No. 54 at 8.)  On December 19, 2022, the parties filed a joint status report.  (Doc. No. 67.)  On May 15, 2023, the parties filed a second joint status report.  (Doc. No. 72.)  On May 23, 2023, the Court lifted the stay, and the Court issued a scheduling order.  (Doc. No. 73.)

On August 9, 2023, the Court entered a bifurcated consent judgment as to Defendant Flores. (Doc. No. 84.) On August 14, 2023, Plaintiff SEC filed an amended complaint. (Doc. No. 87, FAC.) On September 11, 2023, the Court entered a bifurcated consent judgment as to Defendant Sripetch. (Doc. No. 92.) On October 5, 2023, Plaintiff SEC voluntarily dismissed entity Defendants DOIT Ltd., Doji Capital, Inc., King Mutual Solutions Inc., Optimus Prime Financial Inc., Orca Bridge, Redline International, and UAIM Corporation. (Doc. Nos. 94-100.) On December 5, 2023, Defendant Wexler filed an answer to Plaintiff's amended complaint. (Doc. No. 109.)

On January 8, 2024, the Court entered a final judgment as to Defendant Flores. (Doc. No. 124.) On January 31, 2024, the Court entered a final default judgment against Defendant Williams. (Doc. No. 129.) On February 12, 2024, the Court issued a scheduling order for the civil action. (Doc. No. 134.)

On April 17, 2024, the Court entered a final judgment as to Defendant Sripetch. (Doc. No. 172.) On April 29, 2024, the Court entered a final default judgment against Defendant Patel. (Doc. No. 174.) On May 1, 2024, the Court entered a final judgment as to Defendant McAlpine. (Doc. No. 177.) On July 24, 2024, Plaintiff SEC voluntarily dismissed entity Defendant Adtron Inc. (Doc. No. 196.) On August 19, 2024, the Court entered a final judgment as to entity Defendant ATG Inc. (Doc. No. 209.)

On September 3, 2024, the Court denied Defendant Wexler's motion to stay this civil action pending resolution of the related criminal case, United States v. Sripetch, 20-cr-160-H. (Doc. No. 214.) On November 18, 2024, the Court entered a consent judgment as to Defendant Knight. (Doc. No. 230.) Defendant Wexler is now the sole remaining defendant in this action.

By the present motion, Plaintiff SEC moves for summary judgment against Defendant Wexler as to liability. (Doc. No. 218-1 at 1, 24.) Specifically, Plaintiff SEC moves for summary judgment that Defendant Wexler violated Section 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Exchanges Act and Rules 10b-5(a) and (c). (Id. at 18-24.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>**Discussion**</u>

**I.    Legal Standards Governing Summary Judgment**

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 if the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). Material facts are facts that, under the governing substantive law, may affect the outcome of the case. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. <u>Id.</u> "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." <u>T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987).

A party seeking summary judgment always bears the initial burden of demonstrating that there is no genuine dispute as to any material fact. <u>Celotex</u>, 477 U.S. at 323. A moving party without the ultimate burden of proof at trial can satisfy its burden in two ways: (1) by presenting "evidence negating an essential element of the nonmoving party's claim or defense;" or (2) by demonstrating "that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." <u>Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.</u>, 210 F.3d 1099, 1102 (9th Cir. 2000). Once the moving party establishes the absence of a genuine dispute as to any material fact, the burden shifts to the nonmoving party to "set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" <u>T.W. Elec. Serv.</u>, 809 F.2d at 630 (quoting former Fed. R. Civ. P. 56(e)); <u>accord Horphag Research Ltd. v. Garcia</u>, 475 F.3d 1029, 1035 (9th Cir. 2007). To carry this burden, the non-moving party "may not rest upon mere allegation or denials of his pleadings." <u>Anderson</u>, 477 U.S. at 256; <u>see also</u> <u>Behrens v. Pelletier</u>, 516 U.S. 299, 309 (1996) ("On summary judgment, . . . the plaintiff can no longer rest on the pleadings.").

Rather, the nonmoving party "must present affirmative evidence . . . from which a jury might return a verdict in his favor." <u>Anderson</u>, 477 U.S. at 256.

When ruling on a summary judgment motion, the court must view the facts and draw all reasonable inferences in the light most favorable to the non-moving party. <u>Scott v. Harris</u>, 550 U.S. 372, 378 (2007). The court should not weigh the evidence or make credibility determinations. <u>See</u> <u>Anderson</u>, 477 U.S. at 255. "The evidence of the non-movant is to be believed." <u>Id.</u> Further, the court may consider other materials in the record not cited to by the parties, but it is not required to do so. <u>See</u> Fed. R. Civ. P. 56(c)(3); <u>see also</u> <u>Simmons v. Navajo Cnty.</u>, 609 F.3d 1011, 1017 (9th Cir. 2010) ("[A] district court has no independent duty 'to scour the record in search of a genuine issue of triable fact.'").

## II.    Preliminary Issues

### A.    Plaintiff SEC's Request to Strike Defendant Wexler's Declaration

As a preliminary matter, Plaintiff SEC moves to strike Defendant Wexler's declaration that was attached to his opposition brief. (Doc. No. 243 at 3-5.) Plaintiff SEC argues that Defendant's Wexler declaration is improper because he previously invoked his Fifth Amendment rights in this action and refused to answer any questions during his deposition. (<u>See</u> <u>id.</u>)

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "This protection extends not only to criminal proceedings, but any proceeding in which the answers might incriminate the individual in a future criminal proceeding," including civil proceedings. <u>United States v. Juv. Male</u>, 670 F.3d 999, 1011 (9th Cir. 2012).

But, "[i]n general, 'the Fifth Amendment privilege cannot be invoked to oppose discovery and then [be] tossed aside to support a party's assertions.'" <u>Cisco Sys., Inc. v. Sheikh</u>, No. 4:18-CV-07602-YGR, 2020 WL 5877573, at *4 (N.D. Cal. Oct. 2, 2020) (quoting <u>S.E.C. v. Zimmerman</u>, 854 F. Supp. 896, 899 (N.D. Ga. 1993)). As such, "the Fifth Amendment privilege cannot be invoked as a shield to oppose depositions while

discarding it for the limited purpose of making statements to support a summary judgment motion." In re Edmond, 934 F.2d 1304, 1308 (4th Cir. 1991); see also S.E.C. v. Bramlette, No. 218CV00761RJSDAO, 2021 WL 1720920, at *2 (D. Utah Apr. 30, 2021) ("[A] party may not use the Fifth Amendment privilege as both a shield and a sword, by invoking the privilege to protect against discovery and then withdrawing the invocation later to defend on the merits." (citing S.E.C. v. Smart, 678 F.3d 850, 854–55 (10th Cir. 2012); United States v. $148,840 in U.S. Currency, 521 F.3d 1268, 1277 (10th Cir. 2008)). A district court may strike a declaration presented at the summary judgment stage where the witness previously asserted the Fifth Amendment privilege during a deposition to avoid answering relevant questions. See, e.g., Smart, 678 F.3d at 854–55 (affirming district court's decision to strike declaration); Edmond, 934 F.2d 1304, 1308 (4th Cir. 1991) (affirming district court's decision to disregard declaration); S.E.C. v. Rose Fund LLC, 156 F. App'x 3, 4 (9th Cir. 2005) (affirming district court's decision to disregard declaration); Munger v. Intel Corp., No. 3:22-CV-00263-HZ, 2023 WL 3260034, at *3 (D. Or. May 3, 2023) (striking declaration); see also United States v. $133,420.00 in U.S. Currency, 672 F.3d 629, 640 (9th Cir. 2012) ("We have long held that a district court may strike the testimony of a witness in a criminal proceeding to avoid a witness's improper use of the Fifth Amendment privilege against self-incrimination as a sword as well as a shield.").

"The purpose of this rule is to protect the integrity and truth-seeking function of the judicial system from the distortions that could occur if a witness could testify and then use the Fifth Amendment privilege to prevent any adversarial testing of the truth of that testimony." $133,420.00 in U.S. Currency, 672 F.3d at 640; see also Nationwide Life Ins. Co. v. Richards, 541 F.3d 903, 910 (9th Cir. 2008) ("'[B]ecause the privilege may be initially invoked and later waived at a time when an adverse party can no longer secure the benefits of discovery, the potential for exploitation is apparent.'").

During the discovery phase of this case, Plaintiff SEC took Defendant Wexler's deposition on September 16, 2024. (See generally Doc. No. 224, Dunnigan Decl. ¶ 25,

Ex. V.)   At his deposition, Defendant Wexler invoked his rights under the Fifth Amendment and refused to answer all substantive questions asked by the SEC.  (See id.)

Through his present declaration, Defendant Wexler now seeks to present testimony on the same subjects that were at issue during his deposition in order to provide support for his opposition to Plaintiff SEC's motion for summary judgment.  For example, during his September deposition, Plaintiff SEC asked Defendant Wexler several questions regarding his interactions with Defendant Knight, and Defendant Wexler invoked his rights under the Fifth Amendment to each of those questions.  (See, e.g., Doc. No. 224-21, Ex. V at 13, 17-19, 41-50.)  But in the present declaration, Defendant Wexler now seeks to present specific testimony regarding his interactions with Defendant Knight.  (See, e.g., Doc. No. 239-1, Wexler Dec. ¶¶ 7, 11, 13, 14, 16, 17, 22, 23.)  This is improper and represents a clear attempt by Defendant Wexler to use the Fifth Amendment as both a shield and a sword in these proceedings.  See S.E.C. v. Premier Holding Corp., No. SACV1800813CJCKESX, 2020 WL 8099514, at *5 (C.D. Cal. Nov. 30, 2020) ("While [defendant] certainly has the right to assert the privilege, he '[cannot have it both ways.  By hiding behind the protection of the Fifth Amendment as to his contentions, he gives up his right to prove them.'").  As such, the Court strikes Defendant Wexler's declaration, (Doc. No. 239-1), and the Court will not consider its contents in deciding the present motion for summary judgment.  See, e.g., Smart, 678 F.3d at 854–55; Edmond, 934 F.2d at 1308; Rose Fund, 156 F. App'x at 4; Munger, 2023 WL 3260034, at *3; Garvin, 2011 WL 1044370, at *2.

    B.    Plaintiff SEC's Request for Adverse Inferences Against Defendant Wexler

As another preliminary matter, Plaintiff SEC requests that the Court draw adverse inferences against Defendant Wexler based on his decision to invoke his Fifth Amendment rights during his deposition in this case.  (See Doc. No. 218-1 at 15-17.)  "When a party asserts the privilege against self-incrimination in a civil case, the district court has discretion to draw an adverse inference from such assertion."  Nationwide Life Ins., 541 F.3d at 911; see S.E.C. v. Colello, 139 F.3d 674, 677 (9th Cir. 1998) ("Parties

are free to invoke the Fifth Amendment in civil cases, but the court is equally free to draw adverse inferences from their failure of proof."). "A decision not to draw the inference poses substantial problems for an adverse party who is deprived of a source of information that might conceivably be determinative in a search for the truth." Nationwide Life Ins., 541 F.3d at 911.

In determining whether to draw an adverse inference, a district court must assess whether the value of presenting the evidence is substantially outweighed by the danger of unfair prejudice to the party asserting the privilege. Id. at 912. In addition, "the inference may not be drawn 'unless there is a substantial need for the information and there is not another less burdensome way of obtaining that information.'" Id. Further, the inference may only be drawn when there is independent evidence of the fact about which the party refuses to testify. Id.; see also S.E.C. v. Strategic Glob. Invs., Inc., 262 F. Supp. 3d 1007, 1023 (S.D. Cal. 2017) ("On summary judgment, an adverse inference alone is not enough to support the absence of a genuine dispute of material fact. Such an inference may be drawn only when there is independent evidence of the fact to which the party refuses to answer.").

During the discovery phase of this case, Plaintiff SEC took Defendant Wexler's deposition on September 16, 2024. (See generally Doc. No. 224, Dunnigan Decl. ¶ 25, Ex. V.) At his deposition, Defendant Wexler invoked his rights under the Fifth Amendment and refused to answer all substantive questions asked by Plaintiff SEC. (See id.) By invoking his Fifth Amendment rights, Defendant Wexler deprived Plaintiff SEC of evidence that was crucial and important to its case. Because Defendant Wexler is in the best position to testify about his specific role in the pump-and-dump scheme at issue, there was a substantial need for this testimony and there is not another less burdensome way for Plaintiff SEC to obtain the information it was seeking. Further, because, during the deposition, Plaintiffs SEC asked Defendant Wexler many questions that went to important issues that are central to Plaintiff SEC's claims here, the value of Defendant Wexler's testimony in response to those questions is not substantially outweighed by any

potential danger of unfair prejudice to Defendant Wexler.[1]  Moreover, courts often draw adverse inferences against defendants who invoke their Fifth Amendment rights to refuse to testify during securities fraud cases brought by the SEC.  See, e.g., Colello, 139 F.3d at 677–78; S.E.C. v. Premier Holding Corp., No. 21-55249, 2022 WL 541194 (9th Cir. Feb. 23, 2022); Strategic Glob. Invs., 262 F. Supp. 3d at 1023; Liu, 262 F. Supp. 3d at 973–74.  As such, the Court, exercising its sound discretion, will draw adverse inferences against Defendant Wexler based on his decisions to invoke his Fifth Amendment rights during his deposition where appropriate below.  Cf Doe ex rel. Rudy-Glanzer v. Glanzer, 232 F.3d 1258, 1265 (9th Cir. 2000) (explaining that courts must "analyz[e] each instance where the adverse inference was drawn, or not drawn, on a case-by-case basis under the microscope of the circumstances of that particular civil litigation"); Williams v. Kohl's Dep't Stores, Inc., No. EDCV19397JGBSHKX, 2020 WL 3882953, at *16 (C.D. Cal. June 16, 2020) ("'[T]he scope of an adverse inference instruction cannot be limitless; rather, it must be tethered to the specific questions asked but not answered.'" (quoting Gonzales v. City of San Jose, No. 13-CV-00695-BLF, 2015 WL 7878121, at *6 (N.D. Cal. Dec. 4, 2015))).

---

[1]    In his opposition, Defendant Wexler asserts that adverse inferences are not necessary here because he has provided testimony on the topics at issue via his declaration that he attached to his opposition. (Doc. No. 239 at 10-11.)  The Court struck Defendant Wexler's declaration that was attached to his opposition.  As such, Defendant Wexler's argument is inapplicable now.

Defendant Wexler also argues that there is not a substantial need for the Court to draw adverse inferences because he produced 230 pages of evidence to Plaintiff SEC during the discovery phase of the case.  The Court rejects Defendant Wexler's argument. (Doc. No. 239 at 11-12.)  The documentary evidence that Defendant Wexler produced in this case is not an adequate substitute for the evidence that Plaintiff SEC sought to obtain from him during his deposition.  Plaintiff SEC still had a substantial need for Defendant Wexler's testimony on relevant issues in this case regardless of the documents that were produced.  See, e.g., S.E.C. v. Liu, 262 F. Supp. 3d 957, 974 (C.D. Cal. 2017) ("there is no alternative less burdensome method of obtaining direct evidence of Liu and Wang's scienter other than . . . from their deposition").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## III.    Analysis of Plaintiff SEC's Claim for Securities Fraud Against Defendant Wexler

Plaintiff SEC moves for summary judgment that Defendant Wexler violated Section 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Exchanges Act and Rules 10b-5(a) and (c).  (Doc. No. 218-1 at 18-24.)  "Section 17(a) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b–5, prohibit fraudulent conduct or practices in connection with the offer or sale of securities."  S.E.C. v. Dain Rauscher, Inc., 254 F.3d 852, 855 (9th Cir. 2001).  "These antifraud provisions prohibit schemes to defraud, and they prohibit 'making a material misstatement or omission in connection with the offer or sale of a security by means of interstate commerce.'"  S.E.C. v. Stein, 906 F.3d 823, 830 (9th Cir. 2018) (quoting Dain Rauscher, 254 F.3d at 855–56).

"Rule 10b–5(a) prohibits persons from employing 'any device, scheme, or artifice to defraud' and Rule 10b–5(c) prohibits persons from engaging 'in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.'"  In re Galena Biopharma, Inc. Sec. Litig., 117 F. Supp. 3d 1145, 1191–92 (D. Or. 2015).  Rules 10b5–(a) and (c) prohibit manipulative or deceptive acts as opposed to Rule 10b5–(b), which prohibits material misrepresentations and omissions.  Id. at 1192.  Claims under Rule 10b5–(a) and (c) of the Exchange Act and Sections 17(a)(1) and 17(a)(3) of the Securities Act are generally referred to as claims for "scheme liability."  Id. (Rules 10b5–(a) and (c)); see, e.g., S.E.C. v. Prakash, 718 F. Supp. 3d 1098, 1107 (N.D. Cal. 2024) (Section 17(a)(3)); S.E.C. v. Dalius, No. 2:18-CV-08497-FWS-E, 2023 WL 3988425, at *5 (C.D. Cal. May 24, 2023) (Section 17(a)(1)).

"To allege a claim for scheme liability, a plaintiff must allege the elements of a securities fraud claim."  Galena Biopharma, 117 F. Supp. 3d at 1192 (citing Stoneridge Invs. Partners, LLC v. Scientific–Atlanta, Inc., 552 U.S. 148, 158 (2008)); see also S.E.C. v. Chen, No. C17-0405JLR, 2019 WL 652360, at *10 (W.D. Wash. Feb. 15, 2019) ("Section 10(b), Rule 10b-5, and Section 17(a) require proof of the same essential elements." (citing S.E.C. v. Phan, 500 F.3d 895, 907-08 (9th Cir. 2007); S.E.C. v.

20-cv-01864-H-BJC

Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir. 1999))).  As such, liability under Sections 17(a)(1) and 17(a)(3) and Rules 10b5–(a) and (c) in an action brought the SEC requires evidence of: (1) a device or scheme to defraud someone; (2) in connection with the purchase or sale of a security; (3) with scienter; and (4) by means of interstate commerce.[2]  See S.E.C. v. Todd, 642 F.3d 1207, 1215 (9th Cir. 2011) (citing Dain Rauscher, 254 F.3d at 855–56); Ninth Circuit Manual of Model Criminal Jury Instructions 15.47 (2024).  The Court addresses each of these elements in turn below.

A.    A Device or Scheme to Defraud

The undisputed evidence in the record shows that Defendant Wexler agreed to participate in a pump-and-dump scheme for Argus stock along with Defendants Sripetch and Knight.  Defendant Knight testifies in his declaration that Defendant Wexler reached out to him and Defendant Sripetch, and the three of them decided to pump-and-dump

_____

[2]    In his opposition brief, Defendant Wexler contends that the relevant elements for Plaintiff SEC's claim are: "(1) a material misrepresentation or omission ('falsity'), (2) made with scienter, (3) in connection with the purchase or sale of a security, (4) reliance on the misrepresentation or omission, (5) economic loss, and (6) loss causation."  (Doc. No. 239 at 13 (citing In re BofI Holding, Inc. Sec. Litig., 977 F.3d 781, 786 (9th Cir. 2020); In re Genius Brands Int'l, Inc. Sec. Litig., 97 F.4th 1171, 1180 (9th Cir. 2024)).)  There are several problems with Defendant Wexler's recitation of the relevant elements.  First, as explained above, Rules 10b5–(a) and (c) prohibit manipulative or deceptive acts as opposed to material misrepresentations and omissions.  See Galena Biopharma, 117 F. Supp. 3d at 1191–92.  Therefore, the first element of the claim is whether the defendant used a device or scheme to defraud someone; not whether the defendant made a material misrepresentation or omission.  Second, the elements of reliance, loss, and loss causation only apply in actions brought by private parties; those elements are inapplicable in actions brought by the SEC.  See S.E.C. v. Tambone, 550 F.3d 106, 130 (1st Cir. 2008), reh'g en banc granted, opinion withdrawn, 573 F.3d 54 (1st Cir. 2009), and opinion reinstated in part on reh'g, 597 F.3d 436 (1st Cir. 2010) ("Because this is an SEC enforcement action rather than a private claim, the Commission need not allege any of the elements required to establish a direct link between a defendant's misrepresentation and an investor's injury—including reliance by the investor on an explicit misstatement, economic loss, and loss causation."); Gebhart v. S.E.C., 595 F.3d 1034, 1041 n.8 (9th Cir. 2010) ("Our focus here is on the elements that the SEC must establish.  The fourth and fifth elements of a private claim are therefore inapplicable.").

Argus stock.   (Doc. No. 219, Knight Decl. ¶ 3.)   In order to execute this scheme, Defendants Knight, Sripetch, and Wexler agreed that: (1) Wexler would transfer Argus stock to Knight purportedly as a "gift;" (2) then they would attempt to raise the price of Argus stock with Sripetch paying for promotional campaigns for Argus stock and Wexler creating and issuing press release for Argus timed to coincide with Sripetch's promotional campaigns; and (3) once the price of the stock had risen, Defendants Knight and Sripetch would then sell the stock and all three of them – Sripetch, Knight, and Wexler – would split the profits obtained from those sales.  (Id. ¶¶ 3-7; Doc. No. 220, Knight Supp. Decl. ¶ 3.)

The undisputed evidence in the record shows that not only did Sripetch, Knight, and Wexler enter into this pump-and-dump scheme agreement, but also that they successfully executed their pump-and-dump scheme in the Spring of 2018.  Via a letter dated March 1, 2018, Defendant Wexler transferred 1,500,000 shares of Argus stock to Defendant Knight.  (Doc. No. 219, Knight Decl. ¶ 5, Ex. A; Doc. No. 220, Knight Supp. Decl. ¶ 2, Ex. A.)  The letter falsely stated that the stock transfer was a gift.  (Id.)  This statement was false because Defendant Knight later shared profits with Defendant Wexler from the pump-and-dump scheme in exchange for this transfer.  (Doc. No. 219, Knight Decl. ¶¶ 5, 7; Doc. No. 220, Knight Supp. Decl. ¶ 3.)

Following the stock transfer, Defendants Sripetch and Wexler engaged in various practices to manipulate the price of Argus stock.  During April 2018, Defendant Sripetch engaged in match trading of Argus stock where he both bought and sold Argus stock simultaneously.  (Doc. No. 219, Knight Decl. ¶ 10; see also Doc. No. 165 at 6.)  From May 2018 through July 2018, Sripetch funded several promotional emails touting Argus stock and encouraging recipients of the emails to purchase Argus stock.  (Doc. No. 219, Knight Decl. ¶ 11; see Doc. No. 223, Tong Decl. ¶¶ 5-9, Exs. A.1-1.9.)   These promotional emails were false or misleading because they did not disclose the funders of the emails' intention to pump-and-dump the Argus stock.  (See id.; see also Doc. No. 165 at 6-7.)  See, e.g., S.E.C. v. Recycle Tech, Inc., No. 12-21656-CIV, 2013 WL 12063952,

at *5 (S.D. Fla. Sept. 26, 2013) (finding a complaint sufficiently identified material misrepresentations and omissions and noting that "[w]hile the newsletters stated that Defendants 'may sell part or all' of its Recycle Tech stock, they failed to disclose that they were definitively selling Recycle Tech shares immediately after issuing the newsletters promoting the stock"); S.E.C. v. Corp. Relations Grp., Inc., No. 6:99CV1222ORL28KRS, 2003 WL 25570113, at *8 (M.D. Fla. Mar. 28, 2003) ("[T]he 'from time to time' language is inadequate to convey the reality of the Veitia Defendants' stock sales, which were intentionally timed rather than coincidental with the publications."). Further, although Defendant Sripetch initially funded these promotion emails, the emails were ultimately paid for from the profits of the later sales of Argus stock that were split between Defendants Sripetch, Knight, and Wexler, meaning that Defendant Wexler ultimately funded in part the promotional emails at issue. (Doc. No. 19, Knight Decl. ¶ 11; Doc. No. 220, Knight Supp. Decl. ¶ 3.) From April 2018 to June 2018, Defendant Wexler issued several press releases concerning Argus. (Doc. No. 219, Knight Decl. ¶ 12; Doc. No. 224, Dunnigan Decl. ¶ 15, Ex. L.) Defendant Wexler timed the issuance of these press releases to coincide with Defendant Sripetch's promotional emails. (See Doc. No. 219, Knight Decl. ¶¶ 12-15, Exs. B, C; Doc. No. 224, Dunnigan Decl. ¶ 16, Ex. M; see also Doc. No. 224-21, Dunnigan Decl. ¶¶ 22, 26, Exs. R, W; Doc. No. 219, Knight Decl. ¶¶ 19-21, 23-24, Exs. D, E, F, H, I.)

To complete this pump-and-dump scheme, from approximately April 2018 to July 2018, Defendant Knight sold 287,070 shares of Argus stock for $751,026. (Doc. No. 223, Tong Decl. ¶¶ 14-15, Exs. C, F.) Defendant Knight then transferred to Defendant Wexler via Derving – an entity controlled by Wexler – $156,877 as his share of the profits from Knight's sales of Argus stock. (See Doc. No. 219, Knight Decl. ¶¶ 6-7, 25-29, Exs. J, K; Doc. No. 220, Knight Supp. Decl. ¶ 3; Doc. No. 221, Melville Decl. ¶ 5, Ex. B; Doc. No. 222, Ruiz Decl. ¶¶ 3-5, Exs. A, B; Doc. No. 223, Tong Decl. ¶¶ 14-15, Exs. C, F.)

In his opposition, Defendant Wexler characterizes Defendant Knight's testimony

as "uncorroborated," and Defendant Wexler contends that the declaration is insufficient to provide a basis for summary judgment in favor of the SEC.  (Doc. No. 239 at 17-18.)  The Court rejects Defendant Wexler's characterization of Knight's declaration.  The declaration is not "uncorroborated."  Defendant Knight's testimony regarding the transfer of Argus stock from Defendant Wexler to him is corroborated by Wexler's letter setting forth the purported "gift" of 1,500,000 shares of Argus stock and emails from Wexler to Knight where Wexler reminds Knight that "one-third of the net proceeds for the sale of Argus . . . will be for the Argus . . . company account" and that "promises made are promises kept."  (Doc. No. 224, Dunnigan Decl. Exs. F, G, H.)  Knight's testimony regarding the press releases is corroborated by the press releases themselves and text messages from Wexler to Knight where Wexler is informing Knight about the timing of these releases.  (See id. Ex. L; Doc. No. 219, Knight Decl. Exs. B, C; see also Doc. No. 224-21, Dunnigan Decl. Exs. R, W; Doc. No. 219, Knight Decl. Exs. D, E, F, H, I.)  In addition, Defendant Knight's testimony regarding the payments he provided to Wexler is corroborated by financial documents showing the payments, testimony from additional witnesses involved in the payment transfers, and text messages from Defendant Wexler confirming the payments.  (See Doc. No. 219, Knight Decl. ¶ 28, Ex. J (text from Wexler providing "payout numbers"); Doc. No. 221, Melville Decl. ¶ 5, Ex. B; Doc. No. 222, Ruiz Decl. ¶¶ 3-5, Exs. A, B; Doc. No. 223, Tong Decl. ¶¶ 14-15, Exs. C, F.)  In sum, Defendant Knight's declaration is corroborated by a substantial amount of additional evidence in the record.

In addition, the testimony in Defendant Knight's declaration is support by the many adverse inferences that the Court can appropriately draw from Defendant Wexler's deposition.  For example, during his deposition, Plaintiff SEC asked Defendant Wexler: (1) "In 2018, did you ever agree with Brehnen Knight to manipulate the stock of Argus?"; and (2) "Did you participate in pump and dump scheme involving Argus in 2018 and 2019?"  (Doc. No. 224-21, Dunnigan Decl. Ex. V at 15-16.)  In response to these two questions, Defendant Wexler invoked his Fifth Amendment rights and refused

to answer these questions.  (Id.)  In light of Defendant Wexler's responses, the Court can infer that Defendant Wexler agreed to enter into a stock manipulation scheme with Defendant Knight and then participated in the above pump-and-dump scheme for Argus stock.

With respect to the Argus press releases and the promotion emails that were issued during the pump-and-scheme, Plaintiff SEC asked Defendant Wexler the following questions during his deposition:

1.    "For the record, these are a collection of Argus press releases from April 20, 2018, to January 17, 2019, and they are in reverse chronological order. . . . Mr. Wexler, did you write these press releases?"  (Id. at 10.)

2.    "Did you review all press releases issued by Argus before they were disseminated?"  (Id.)

3.    "Did you submit Argus press releases in 2018 and '19, posting on the OTC markets' website?"  (Id. at 12.)

4.    "Did you ever review any promotional campaigns of Argus?"  (Id. at 20.)

5.    "Were you aware that there were promotional materials disseminated in 2018 and 2019 that encouraged investors to purchase Argus?"  (Id.)

6.    "Did you coordinate the timing of press releases to coincide with promotion materials of – the dissemination of promotional materials of Argus?"  (Id. at 20-21.)

7.    "Was the purpose of the promotional campaign and the press releases to increase investor interests in Argus?"  (Id. at 21.)

8.    "Did you seek to increase Argus's liquidity through promotional materials and press releases?"  (Id.)

9.    "Were you responsible for the timing of these press releases?"  (Id. at 23.)

10.    "When you issued Argus' press releases, were you following Knight's instructions from the text marked Exhibit 11?"  (Id. at 24.)

11.    "Were your activities with Knight and Sripetch in 2018 and 2009 (sic) intended to raise the stock price of ARGW?"  (Id. at 48.)

12.    "Were your activities with Knight and Sripetch in 2018 and 2009 (sic) intended to raise liquidity in the stock price of ARGW?"  (Id.)

13.    "Did you intend to defraud investors who had purchased stock in ARGW?" (Id.)

In response to all these questions, Defendant Wexler invoked his Fifth Amendment rights and refused to answer these questions.  (Id. at 10, 12, 20-21, 23-24, 48.)  In light of Defendant Wexler's responses, the Court can infer that Defendant Wexler drafted and issued the press releases at issue, timed the issuance of these press release to coincide with Sripetch's promotion emails, and did so with the intent and purpose to increase the liquidity of Argus stock and defraud investors.

With respect to the profits Defendant Wexler received from the pump-and-dump scheme, at his deposition, Plaintiff SEC asked Defendant Wexler: "In 2018 and 2019, did you control an entity called Derving Enterprises?"  (Id. at 33.)  Plaintiff SEC then asked Defendant Wexler about each of the wire payments that was sent to Derving by Defendant Knight and further asked if those payments "reflect a share of your proceeds from the Argus stock manipulation in spring of 2018?"  (Id. at 33-34.)  In response to all these questions, Defendant Wexler invoked his Fifth Amendment rights and refused to answer these questions.  (Id.)  In light of Defendant Wexler's responses, the Court can infer that Defendant Wexler controlled Derving, received several wire payments from Defendant Knight via Derving, and these wire payments represented Defendant Wexler's proceeds from the pump-and-dump scheme.

In sum, the undisputed evidence in the record along with the adverse inferences that the Court may appropriately draw demonstrate that Defendant Wexler actively participated in a pump-and-dump scheme for Argus stock along with Defendants Sripetch and Knight.  This evidence is sufficient to satisfy the "a device or scheme to defraud someone" element of Plaintiff SEC's claim.  See S.E.C. v. Verges, 716 F. Supp. 3d 456, 469 (N.D. Tex. 2024) (District courts "have held that participating in a pump-and-dump scheme is a deceptive or manipulative act because the acts propelling the scheme entail

deceptive conduct.") (collecting cases); <u>Galena Biopharma</u>, 117 F. Supp. 3d at 1196 ("a 'pump-and-dump stock scheme is a classic violation' of Rules 10b–5(a) and (c)"); <u>see, e.g.</u>, <u>S.E.C. v. Airborne Wireless Network</u>, 2023 WL 5938527, at *23–25 (S.D.N.Y. Sept. 12, 2023) (granting SEC's summary judgment motion on scheme liability for defendants' varying participation in a pump-and-dump scheme and explaining "[c]ourts have determined that those playing a leading role in the larger scheme as a whole – and in particular a pump-and-dump scheme – are liable for that scheme").

   B. <u>In Connection with the Purchase or Sale of a Security</u>

   Under this element, "the fraud in question must relate to the nature of the securities, the risks associated with their purchase or sale, or some other factor with similar connection to the securities themselves." <u>Ambassador Hotel Co. v. Wei-Chuan Inv.</u>, 189 F.3d 1017, 1026 (9th Cir. 1999). "While the fraud in question need not relate to the investment value of the securities themselves, it must have more than some tangential relation to the securities transaction." <u>Id.</u> Misrepresentations about the nature of a security are "surely" in connection with that security. <u>Fleming v. Charles Schwab Corp.</u>, 878 F.3d 1146, 1156 (9th Cir. 2017).

   The undisputed evidence in the record shows that the misrepresentations at issue were made in connection with the sale of publicly traded Argus stock. For example, during a promotional scheme executed by Defendants, Sripetch, Knight, and Wexler touting Argus stock from approximately April 2018 to July 2018, Defendant Knight sold 287,070 shares of Argus stock for $751,026, and then transferred to Wexler via Derving $156,877 as his share of the profits from the sale of the Argus stock. (Doc. No. 219, Knight Decl. ¶¶ 6-7, 25-29, Exs. J, K; Doc. No. 220, Knight Supp. Decl. ¶ 3; Doc. No. 221, Melville Decl. ¶ 5, Ex. B; Doc. No. 222, Ruiz Decl. ¶¶ 3-5, Exs. A, B; Doc. No. 223, Tong Decl. ¶¶ 14-15, Exs. C, F; <u>see also</u> Doc. No. 224-21, Dunnigan Decl. Ex. V at 33-34.) This is sufficient to satisfy the "in connection with the purchase or sale of a security" element of Plaintiff SEC's claim. <u>See</u> <u>S.E.C. v. Rana Rsch., Inc.</u>, 8 F.3d 1358, 1362–63 (9th Cir. 1993) (explaining that defendants' issuance of a press release coupled

with public trading in the stock thereafter "satisfies the 'in connection with' requirement"); S.E.C. v. Corp. Rels. Grp., Inc., No. 6:99CV1222ORL28KRS, 2003 WL 25570113, at *9 (M.D. Fla. Mar. 28, 2003) ("[T]he Veitia Defendants' omission of material information was 'in connection with' the purchase or sale of securities. The Veitia Defendants were acquiring stock and then selling that stock while recommending that their readers purchase those same stocks."); S.E.C. v. Blavin, 557 F. Supp. 1304, 1310–11 (E.D. Mich. 1983) ("Nor can there be any dispute that the statements were made in connection with the purchase and sales of securities. The sole purpose of the newsletters was to recommend the purchase of certain stock, which was exactly the same stock that Blavin was contemporaneously buying and selling."). Indeed, in his opposition brief, Defendant Wexler does not contest that Plaintiff SEC has satisfied the "in connection with the purchase or sale of a security" element of its claim. (See generally Doc. No. 239 at 13-18.)

C.    Scienter

In a securities fraud case, to satisfy the element of scienter, "the plaintiffs must show that defendants engaged in 'knowing' or 'intentional' conduct." S. Ferry LP v. Killinger, 542 F.3d 776, 782 (9th Cir. 2008); Abdo v. Fitzsimmons, No. 17-CV-00851-TSH, 2021 WL 616324, at *11 (N.D. Cal. Feb. 17, 2021). "Reckless conduct may also constitute scienter." Todd, 642 F.3d at 1215; see Killinger, 542 F.3d at 782; see also S.E.C. v. Platforms Wireless Int'l Corp., 617 F.3d 1072, 1093 (9th Cir. 2010) ("scienter requires either 'deliberate recklessness' or 'conscious recklessness'"). "Reckless conduct is a highly unreasonable act or omission that is an 'extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" Todd, 642 F.3d at 1215 (quoting Dain Rauscher, 254 F.3d at 856). "'Scienter can be established by direct or circumstantial evidence.'" Gebhart, 595 F.3d at 1041.

The undisputed evidence in the record shows that Defendant Wexler intentionally and knowingly participated in a pump-and-dump scheme for Argus stock that was

designed to mislead investors. Defendant Wexler agreed to enter into a pump-and-dump scheme for Argus stock with Defendants Sripetch and Knight. (Doc. No. 219, Knight Decl. ¶ 3.) In agreeing to be a part of the pump-and-dump scheme, Defendant Wexler was aware: (1) that his role in the scheme was to transfer Argus stock to Defendant Knight and then issue press releases in an effort to create liquidity in the stock; (2) that Defendant Sripetch's role in the scheme was to pay for promotional campaigns for Argus stock in an effort to create liquidity in the stock; and (3) Defendant Knight's role in the scheme was to then sell the stock and share the profits from the sales with Defendants Wexler and Sripetch. (Id. ¶¶ 3-7; Doc. No. 220, Knight Supp. Decl. ¶ 3.) Defendant Wexler actively participated in the scheme by transferring Argus stock to Defendant Knight; issuing press releases for Argus following the transfer and communicating with Defendant Knight about the timing of the press releases; and receiving profits from the scheme from Defendant Knight via Derving. (See Doc. No. 219, Knight Decl. ¶¶ 5-7, 11-15, 19-21, 23-24, 25-29, Exs. A, B, C, D, E, F, H, I, K, K; Doc. No. 220, Knight Supp Decl. ¶¶ 2-3, Ex. A; Doc. No. 224, Dunnigan Decl. ¶¶ 10, 15-16, 22, 26, Exs. H, L, M, R, W; Doc. No. 221, Melville Decl. ¶ 5, Ex. B; Doc. No. 222, Ruiz Decl. ¶¶ 3-5, Exs. A, B; Doc. No. 223, Tong Decl. ¶¶ 14-15, Exs. C, F.)

In addition, a finding of scienter is also supported by the many adverse inferences that the Court can appropriately draw from Defendant Wexler's invocation of his Fifth Amendment rights during his deposition. See, e.g., Liu, 262 F. Supp. 3d at 974 (finding that adverse inferences supported a finding of scienter); S.E.C. v. Sun Empire, LLC, No. SACV09399DOCRNBX, 2010 WL 11506429, at *14 (C.D. Cal. Sept. 13, 2010) ("[Defendant]'s repeated invocation of the Fifth Amendment in response to discovery requests and during her deposition bolster that adverse inference as to her scienter, though it is insufficient to establish guilt."). During his deposition, Plaintiff SEC asked Defendant Wexler many targeted questions about his role in the pump-and-dump scheme, including specific questions about his intent, such as: (1) "Were your activities with Knight and Sripetch in 2018 and 2009 (sic) intended to raise the stock price of ARGW?;"

20-cv-01864-H-BJC

(2) "Were your activities with Knight and Sripetch in 2018 and 2009 (sic) intended to raise liquidity in the stock price of ARGW?;" and "Did you intend to defraud investors who had purchased stock in ARGW?"  (See Doc. No. 224-21, Dunnigan Decl. Ex. V at 48; see also id. at 10, 12, 15-16, 20-21, 23-24, 33-34.)  In response to all these questions, Defendant Wexler invoked his Fifth Amendment rights and refused to answer the questions.  (See id.)  In light of his responses, the Court can infer that: (1) Defendant Wexler knowingly agreed to be a part of a stock manipulation pump-and-dump scheme for Argus stock; (2) he drafted and issued press releases as part of the scheme and timed the issuance of the press release to coincide with Defendant Sripetch's promotional emails with the intent and purpose to increase the liquidity of Argus stock and defraud investors; and (3) he knowingly received payments from Defendant Knight via Derving that represented Wexler's proceeds from the pump-and-dump scheme.

In sum, the undisputed evidence in the record along with the adverse inference that the Court may appropriately draw demonstrate that Defendant Wexler knowingly and intentionally participated in a pump-and-dump scheme to manipulate the market for Argus stock and defraud investors.  This is sufficient to satisfy the scienter element of Plaintiff SEC's claim.  See, e.g., Liu, 262 F. Supp. 3d at 974; Corp. Rels. Grp., 2003 WL 25570113, at *9 ("The Defendants' scalping practice—the acquisition of stock, followed by touting of that stock in an effort to drive up the price, followed by a sale of that stock at a substantial profit—shows an intent to manipulate the market in a manner proscribed by the securities laws.").

D.    By Means of Interstate Commerce

The undisputed evidence in the record shows that the promotional misrepresentations and press releases at issue were disseminated via the internet.  (See Doc. No. 219, Knight Decl. ¶¶ 6-7, 11-12, 18; Doc. No. 223, Tong Decl. ¶¶ 5-9, Exs. A.1-A.9; Doc. No. 224, Dunnigan Decl. ¶ 15, Ex. L.)  This is sufficient to satisfy the "interstate commerce" element.  See, e.g., Recycle Tech., 2013 WL 12063952, at *7 (finding the "interstate commerce" element satisfied where the representations at issues

were made through the internet); see also S.E.C. v. Levin, No. 12-21917-CIV, 2013 WL 594736, at *12 (S.D. Fla. Feb. 14, 2013) ("[T]he Internet, which necessarily includes email, is an 'instrumentality of interstate commerce.'").

In addition, the undisputed facts show that Defendant Wexler communicated with Defendant Knight via his phone during the course of the fraudulent scheme.  (See, e.g., Doc. No. 219, Knight Decl. ¶¶ 13, 15, 28, Exs. B, C, J; Doc. No. 224, Dunnigan Decl. ¶ 16, Ex. M.)  This also satisfies the "interstate commerce" element.  See United States v. Clayton, 108 F.3d 1114, 1117 (9th Cir. 1997) (explaining that telephones and cell phones are instrumentalities of interstate commerce); see, e.g., S.E.C. v. USA Real Est. Fund 1, Inc., 30 F. Supp. 3d 1026, 1035 (E.D. Wash. 2014) ("[Defendant] also made extensive use of the Internet, emails, telephone calls to persons outside Washington (such as Marek of Merrill Lynch) to perpetrate his fraud, satisfying the jurisdictional, interstate commerce element.").  Indeed, in his opposition brief, Defendant Wexler does not contest that Plaintiff SEC has satisfied the "by means of interstate commerce" element of its claim.  (See generally Doc. No. 239 at 13-18.)

E.  Conclusion

In sum, the undisputed facts in the record along with the appropriately drawn adverse inferences demonstrate that Plaintiff SEC has satisfied each element of its claim for securities fraud in violation of Section 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Exchanges Act and Rules 10b-5(a) and (c) against Defendant Wexler.  As such, Plaintiff SEC is entitled to judgment as a matter of law on its claim for securities fraud against Defendant Wexler.

/ / /

/ / /

/ / /

## <u>Conclusion</u>

For the reasons above, the Court grants Plaintiff SEC's motion for summary judgment as to Defendant Wexler's liability.  In addition, the Court vacates the pretrial conference in this action and the related deadlines.  (<u>See</u> Doc. Nos. 217, 238.)  Plaintiff SEC must file a motion regarding remedies against Defendant Wexler, including injunctive relief, disgorgement, and civil penalties, within 45 days from the date this order is filed.  (<u>See</u> Doc. No. 218-1 at 1 n.1.)

**IT IS SO ORDERED.**

DATED: December 16, 2024

MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT

20-cv-01864-H-BJC